**David Verner TOUSLEY, Appellee,**

v.

**NORTH AMERICAN VAN LINES, INC., Appellant.**

No. 84–1226.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 29, 1984.

Decided Jan. 10, 1985.

David J. Armstrong, Pittsburgh, Pa. (M. Richard Dunlap, William D. Clifford, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., on brief), for appellant.

John Furman Daniel, Jr., Greenville, S.C., for appellee.

Before SPROUSE and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

SPROUSE, Circuit Judge:

North American Van Lines appeals the judgment of the district court, entered after a jury verdict, awarding David Verner Tousley $1,200 treble damages, $5,000 punitive damages, and $22,500 in attorney's fees, under the South Carolina Business Opportunity Sales Act [1] and the South Carolina Unfair Trade Practices Act.[2] The suit resulted from North American's failure to comply with the Business Opportunity Sales Act when it recruited Tousley to haul cargo for it as an "owner-operator" and induced him to purchase a tractor from North American. North American contends that the Interstate Commerce Act [3] preempted the application of the Business Opportunity Sales Act, that application of the South Carolina statutes was an impermissible burden on interstate commerce, that the underlying transaction between it and Tousley was specifically exempted by language in the Unfair Trade Practices Act, that the evidence in the case did not establish a violation of the South Carolina statutes, that awarding punitive damages was error, that awarding treble damages was error, and that the district court abused its discretion by awarding unreasonable attorney's fees under the South Carolina statutes. We agree with North American that the awarding of punitive damages is not authorized by the South Carolina statutes and reverse that portion of the district court's judgment. We affirm the decision in all other respects.

## I. Facts

A principal practice in North American's operation is the recruitment of "owner-operators" to drive tractor trailers that haul cargo for its customers. Under this scheme, the owner-operator purchases a tractor from North American. North American owns all of the trailers, negotiates hauling agreements, and assigns runs to drivers across the country.[4]

Tousley became aware of these opportunities by reading an advertisement in the *Greenville News*, a South Carolina newspaper. The advertisement described the opportunities available to an owner-operator and invited interested persons to attend a seminar at a motel in Spartanburg, South Carolina where they would receive "complete details on this outstanding opportunity." The advertisement also stated, "We have an excellent tractor purchase program and free training if you qualify."

Tousley attended the seminar where oral representations and written material were presented to him and others by a North American recruiting representative. Among other things, North American offered to train Tousley as a truck driver, sell him a truck, finance his purchase of the truck, and dispatch him and his truck to places where he would pick up freight for transportation. The representative stated that Tousley should earn gross income of $71,000 a year and, after subtracting the payments on his truck and other expenses, should net between $16,000 and $19,000 a year. The following day Tousley paid the representative $400 in order to attend the North American training school. The check was negotiated in Greenville, South Carolina.

Soon thereafter, Tousley entered North American's training school in Fort Wayne, Indiana, and while there purchased a truck from North American and executed a contract and security agreement. He operated the truck for approximately two years hauling freight for North American but realized considerably less income than the

---

**1.** S.C.CODE ANN. §§ 39–57–10 to –80 (Law. Co-op. Supp.1983).

**2.** S.C.CODE ANN. §§ 39–5–20 to –160 (Law. Co-op. 1976).

**3.** 49 U.S.C. §§ 10101–11901 (1982).

**4.** The owner-operator usually pays to North American ten percent of the cash sale price of the tractor as a down payment. The owner-op-

erator further executes a non-negotiable security agreement granting North American a security interest in the tractor. This security agreement also provides for a set finance charge, life and accident insurance requirements, and conditions of default under the agreement. If default occurs, the unpaid balance of the purchase price becomes immediately due and payable.

amounts mentioned by the recruiting representative. Tousley decided to terminate his relationship with North American but to continue working as an independent trucker. Accordingly, he attempted to refinance his tractor through various financial institutions. When this effort proved unavailing, Tousley consented to a voluntary repossession of the tractor by North American. Tousley instituted this action based on the Business Opportunity Sales Act and common law fraud.[5]

## II. South Carolina and Federal Law

North American concedes that it did not comply with the requirements of the Business Opportunity Sales Act. However, North American argues, among other things, that this state statute is preempted by the Interstate Commerce Act and impedes interstate commerce in violation of the commerce clause.

### a) *The Business Opportunity Sales Act*

The Business Opportunity Sales Act requires entrepreneurs who sell "business opportunities" in South Carolina to comply with registration and other requirements. The promoters must file with the Secretary of State and provide to the purchaser a written disclosure of various aspects of the offer, including the name and business history of the seller, a financial statement of the seller and a description of the services or training to be supplied. S.C.CODE ANN. §§ 39–57–30, 39–57–50 (Law. Co-op. Supp.1983). The promoter also must post a security bond or establish a trust account if he guarantees that the purchaser will derive income that exceeds the price paid for the opportunity. S.C.CODE ANN. § 39–57–40 (Law. Co-op. Supp.1983). The Act further requires that each purchaser be provided with a written contract setting forth the terms of the sale. S.C.CODE ANN. § 39–57–70 (Law. Co-op. Supp.1983). The obvious purpose of the Business Opportunity Sales Act is to alert South Carolina citizens to the possibility that investments in business ventures may be ill-conceived and to provide some protection from unscrupulous promoters.

Additionally, S.C.CODE ANN. § 39–57–80(e) (Law. Co-op. Supp.1983) makes a violation of one of the Act's provisions a violation of the state Unfair Trade Practices Act. S.C.CODE ANN. § 39–5–20 (Law. Co-op. 1976). The Business Opportunity Sales Act refers to damages and attorney's fees but makes no specific provision for punitive damages. S.C.CODE ANN. § 39–57–80(b) (Law. Co-op. Supp.1983). The Unfair Trade Practices Act, however, provides that treble damages shall be awarded by the court if it finds the defendant's actions were willful or knowing. S.C.CODE ANN. § 39–5–140(a) (Law. Co-op. 1976).

### b) *The Preemption Issue*

North American contends that portions of the Interstate Commerce Act and regulations issued thereunder control the same conduct regulated by the Business Opportunity Sales Act and therefore preempt the state statute. North American concedes that the Interstate Commerce Act contains no explicit language that would prevent South Carolina from regulating leasing and sales activity within the boundaries of the state, but argues that 49 U.S.C. § 11107 (1982) expresses congressional intent to occupy the area of lease arrangements in the trucking industry to the exclusion of state regulation. While we recognize that the Interstate Commerce Commission ("ICC") may promulgate regulations affecting leasing practices, *American Trucking Association v. United States*, 344 U.S. 298, 312, 73 S.Ct. 307, 315, 97 L.Ed. 337 (1952), we disagree that preemption in this case is a necessary corollary to this power.

The underlying rationale of the preemption doctrine is that the supremacy clause[6] invalidates state laws that "interfere with or are contrary to, the laws of congress...." *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824). Where Congress has expressly declared that its authority is exclusive, conflicting state

---

**5.** The jury returned a verdict in favor of North American on the fraud count.

**6.** U.S. Const. Art. VI, § 2.

laws are clearly preempted. *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). If Congress has not clearly manifested its intent to preempt, the court must look to the structure and purpose of the statutes at issue to ascertain whether Congress has implicitly and unmistakably directed that its enactments are to supersede state statutes. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). However, "[t]he exercise of federal supremacy is not lightly to be presumed," *Schwartz v. Texas*, 344 U.S. 199, 203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952), and "the historic police powers of the States [are] not to be superseded by [federal regulation] unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

■ Congressional intent to preempt, in the absence of express language to that effect, may be evidenced by the existence of either a scheme of federal regulation so pervasive as to lead to the inference that Congress has left no room for the states to supplement it, or a federal interest in the field so dominant that the federal system precludes enforcement of state laws on the same subject. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). Even if the congressional enactment is not so pervasive as to foreclose state legislation, preemption will nonetheless result if there is an "irreconcilable conflict between federal and state standards." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 626, 78 L.Ed.2d 443 (1984).

The foregoing authorities indicate that, in the absence of express preemption by Congress, the examination of any preemption issue involves a two-tier inquiry: (1) whether Congress in passing the statute intended to occupy the field, or (2) whether the state statute is void because it conflicts with federal regulation. *See Silkwood v. Kerr-McGee Corp.*, 104 S.Ct. at 621 (1984).

Applying these principles to this case, we first examine the involved federal statute. Section 11107 provides that the ICC may require a motor carrier that leases motor vehicles for transporting property to make the arrangements in writing, specify the duration of the agreement and compensation to be paid, provide a copy of the arrangement in the motor vehicle, inspect the vehicle and obtain insurance, and be responsible for operating the vehicle in compliance with applicable safety regulations. 49 U.S.C. § 11107(a)(1)–(4) (1982).

■ Pursuant to section 11107, the ICC promulgated leasing regulations.[7] 49 C.F.R. § 1057 (1983). The regulations impose lease requirements, including that the agreements be in writing, that receipts identifying equipment be given, that certain records be kept, that terms of compensation be clearly specified, and that insurance requirements be met.

■ The ICC has stated that the objective of these regulations is to ensure truth-in-leasing by fostering disclosure. *Lease and Interchange of Vehicles, Ex Parte No. MC-43 (Sub-No. 7)*, 129 M.C.C. 700, 706–08 (1978). An examination of the regulations and statute, however, reveals no pervasive regulatory scheme or dominant federal interest in regulating pre-contractual activities such as are regulated by the South Carolina statute.

North American argues, however, that the ICC has expressly held that transactions involved in negotiating the lease agreement are to be free from governmental regulation. It points to language in *Lease and Interchange of Vehicles, Ex Parte No. MC-43 (Sub-No. 7)*, 131 M.C.C.

---

**7.** It is clear that federal regulations, as well as federal statutes, may have preemptive effect. *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 151, 102 S.Ct. 3014, 3021, 73 L.Ed.2d 664 (1982); *United States v. Jones*, 707 F.2d 1334, 1336–37 (11th Cir.1983).

141, 156 (1979), where the ICC, in adopting 49 C.F.R. § 1057.12(j),[8] stated:

> The intent of the rule is not to prohibit freely negotiated sales or rental transactions between carrier lessees and their lessors. The thrust of the rule is only to prohibit lessees from imposing sales or rental agreements on lessors as a precondition to leasing arrangements.... Lessors and lessees are still completely free to bargain at arm's length and negotiate the sale or rental of any products, equipment, or services.

■ In our view this explanatory statement does not rise to the level of a "clear and manifest" expression of the agency's intent to preempt the state's power to regulate pre-contractual negotiations. If anything, the agency appears to be declining to regulate this aspect of leasing arrangements. In such circumstances, it has been held that the state retains "the implied reservation of power to fill out the scheme." *KVUE, Inc. v. Austin Broadcasting Corp.*, 709 F.2d 922, 934 (5th Cir. 1983) (quoting *Smith v. Pingree*, 651 F.2d 1021, 1025 (5th Cir.1981)), *see also Pharmaceutical Society of New York, Inc. v. Lefkowitz*, 586 F.2d 953, 958 n. 6 (2nd Cir.1978). Of similar import is the Supreme Court's opinion in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), where the court held that a state statute providing that a producer or refiner of petroleum must provide voluntary allowances to all service stations it supplies was not preempted by the congressional expression of policy favoring competition found in the Clayton Act and Robinson-Patman Act. The Court reasoned that "it is illogical to infer that by excluding certain competitive behavior from the general ban against discriminatory pricing, Congress intended to preempt the States' power to prohibit any conduct within that exclusion." 437 U.S. at

132, 98 S.Ct. at 2217. *See also FERC v. Mississippi*, 456 U.S. 742, 787, 102 S.Ct. 2126, 2152, 72 L.Ed.2d 532 (1983) (O'Connor, J., concurring) ("The states usually retain the power to complement congressional legislation, either by regulating details unsupervised by Congress or by imposing requirements that go beyond the national threshold."). In short, we are not persuaded that the Interstate Commerce Act and the regulations promulgated thereunder express a congressional intent to occupy the field of truck leasing to the exclusion of the state statute involved in this case.

■ North American next contends that the South Carolina statutes conflict with the purpose and objectives of the Interstate Commerce Act. In resolving this issue, we look to the Supreme Court's decision in *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973), where we are directed to examine the purposes behind the potentially conflicting statutes, and told that state law should be preempted "only to the extent necessary to protect the achievement of the aims of the [federal act]." *Ware*, 414 U.S. at 127, 94 S.Ct. at 390. Examined under that test, the interaction of the statutes at issue here creates no irreconcilable conflict.

The avowed purpose of section 11107 and the regulations is to encourage truth-in-leasing through disclosure at the time of the execution of the lease agreement. The regulation appears to be aimed toward solidifying the terms of the agreement to protect the parties operating under it. The Business Opportunity Sales Act, however, regulates the conduct of a seller *prior* to the time it executes an agreement with a buyer in order that the buyer may avoid executing an agreement that may be disadvantageous to him. The Act requires (1)

---

8. 49 C.F.R. § 1057.12(j) (1983) provides:

(j) Products, equipment, or services from authorized carrier—The lease shall specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement. The

lease shall specify the terms of any agreement in which the lessor is a party to an equipment purchase or rental contract which gives the authorized carrier the right to make deductions from the lessor's compensation for purchase or rental payments.

delivering a disclosure statement to the buyer at least forty-eight hours prior to executing the contract, S.C.CODE ANN. § 39–57–30 (Law. Co-op. Supp.1983), (2) filing the disclosure statement with the Secretary of State prior to advertising the business opportunity, S.C.CODE ANN. § 39–57–50(a) (Law. Co-op. Supp.1983), (3) filing notification of establishment of a bond or trust account, *id.*, and (4) including a registration number in all advertising, S.C.CODE ANN. § 39–57–50(b) (Law. Co-op. Supp.1983). Additionally, the Business Opportunity Sales Act prohibits sellers from making certain representations in inducing customers to purchase the business opportunity. S.C.CODE ANN. § 39–57–60 (Law. Co-op. Supp.1983).

The requirements of the South Carolina statute complement the policies of the Interstate Commerce Act. By protecting individuals from being enticed to participate in fly-by-night or more sinister types of business opportunities, the South Carolina statute furthers the truth-in-leasing policy expressed in the Interstate Commerce Act and regulations. In fact, the requirement of disclosure by the party with both complete control of the information and the power to grant the business opportunity facilitates rather than inhibits a true arm's-length transaction.

#### c) *The Commerce Clause Issue*

■ The commerce clause provides that "Congress shall have power ... [t]o regulate commerce ... among the several states." [9] North American correctly points to this expansive constitutional provision as prohibiting direct state regulation of interstate commerce. We disagree, however, with North American's contention that the Business Opportunity Sales Act comes within this proscription. The Act applies evenly to all persons who desire to sell business opportunities in South Carolina and is intended to effectuate a legitimate public interest—the protection of South Carolina residents from being victimized by ill-conceived or unscrupulous investment opportunities. It goes without saying that

a state's interest in protecting investors is an important concern. *See Underhill Associates, Inc. v. Bradshaw*, 674 F.2d 293, 295 (4th Cir.1982).

We need look no further than *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), to discern that this South Carolina statute does not violate the commerce clause:

> Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." ... The Commerce Clause, however, permits only incidental regulation of interstate commerce by the states; direct regulation is prohibited.

457 U.S. at 640, 102 S.Ct. at 2640 (citations omitted).

■ North American's argument that the South Carolina statute violates the commerce clause because it regulates business practices that occur outside South Carolina is equally without merit. While we recognize that a state may not regulate activity that takes place wholly outside the state's borders, *Edgar v. MITE Corp.*, 457 U.S. at 642, 102 S.Ct. at 2641, the precontractual conduct implicated in this case took place in South Carolina. Although Tousley's training and the execution of the security agreement and operator's contract occurred in Indiana, the advertising, recruiting, and initial payment were all completed in South Carolina.

### III. Other Liability Contentions

#### a) *Exemption from Unfair Trade Practices Act*

■ North American next argues that the South Carolina Unfair Trade Practices Act exempts the instant transaction from

---

**9.** U.S. Const. Art. I, § 8, cl. 3.

its coverage, citing this language from the Act:

> Nothing in this article shall apply to: (a) Actions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of this State or the United States or actions or transactions permitted by any other South Carolina State law.

S.C.CODE ANN. § 39–5–40 (Law. Co-op. 1976). For the reasons expressed in Part II of this decision, we are of the opinion that the transactions regulated here are of a different kind and character than those covered by the Interstate Commerce Act and the ICC regulations. *See Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207, 1220 (4th Cir.1983) (exemption under § 39–5–40 "relates only to fields extensively governed by federal law where federal preemption might otherwise apply."). North American therefore cannot avail itself of this exemption.

### b) *Applicability of Business Opportunity Sales Act to Facts of this Case*

■ North American contends that its successful recruitment of Tousley and the subsequent execution of the agreements did not amount to a "business opportunity" under the Business Opportunity Sales Act. The Act provides in pertinent part:

> As used in this chapter "business opportunity" means the sale or lease of any products, equipment, supplies or services which are sold to the purchaser for the purpose of enabling the purchaser to start a business and in which the seller represents:
>
> . . . .
>
> (3) That he guarantees that the purchaser will derive income from the business opportunity which exceeds the price paid for the business opportunity; or . . .
>
> (4) That upon payment by the purchaser of a fee or sum of money which exceeds fifty dollars to the seller, the seller will provide a sales program or marketing program which will enable the purchaser to derive income from the business opportunity which exceeds the price paid for the business opportunity;

S.C.CODE ANN. § 39–57–20 (Law. Co-op. Supp.1983). North American does not dispute that there was a sale or lease as described by the Act, but it contends that none of the four alternative requirements is present. The question of whether North American violated subsection (3) or (4), however, was a factual issue properly submitted to the jury, and we conclude that there was more than sufficient evidence upon which the jury could have based its finding against North American.

### IV. Damages

The district court instructed the jury that if it found that North American's conduct was reckless, it was entitled to award punitive damages. The jury awarded Tousley $400 actual damages and $5,000 punitive damages. The Unfair Trade Practices Act provides that if the court finds a willful or knowing violation, the actual damages shall be trebled. S.C.CODE ANN. § 39–5–140(a) (Law. Co-op. 1976). The court trebled the $400 actual damages and the final judgment reflected $1,200 treble damages and $5,000 punitive damages.

■ There are no South Carolina cases to guide our determination, but, in our opinion, the Business Opportunity Sales Act does not contemplate punitive damages. The Act provides that any purchaser injured by a violation of the Act may sue for "damages." S.C.CODE ANN. § 39–57–80(b) (Law. Co-op. Supp.1983). Additionally, a violation of the Act constitutes a violation of the Unfair Trade Practices Act, S.C.CODE ANN. § 39–57–80(e) (Law. Co-op. 1983 Supp.), which directs the court to treble the damages awarded by a jury if the court finds a willful or knowing violation. This would seem to comprise the entire statutory damage scheme. Had the Legislature desired to pyramid damages by authorizing recovery of both treble and punitive damages, it likely would have done so specifically. *See, e.g.*, S.C.CODE ANN. § 56–15–110(3) (Law. Co-op. 1976) (authorizing punitive damage award for violation of regulation dealing with motor vehicle

dealers); S.C.CODE ANN. § 15–69–210 (Law. Co-op. 1976) (punitive damages in action to recover possession of personal property); S.C.CODE ANN. § 15–51–40 (Law. Co-op. 1976) (exemplary damages in wrongful death suits).

 That portion of the judgment awarding $5,000 punitive damages is reversed and remanded to the district court with directions to strike that portion of the award. Finding the court's action in awarding treble damages to be without error, we affirm that part of the award.

### V. Attorney's Fees

At the conclusion of the case, the district court awarded Tousley $22,500 attorney's fees. Prior to making that award, the court reviewed briefs submitted by both parties and made the factual findings mandated by our decisions and decisions of the Supreme Court. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir.1978). We find no abuse in the exercise of its discretion.

The judgment of the district court is therefore affirmed except as to that part relating to punitive damages. That portion of the judgment is reversed and remanded with instructions.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.