853 F.2d 268
 57 USLW 2127
 Francisco S. JIMENEZ, Plaintiff-Appellee,
v.
BP OIL, INC., Defendant-Appellant.
James PALMER; Torsak Rossaki; French Ray; Leon Uzarowski;
Anton A. Bond; Farzin Afsahi; Ojan Fakhriyazdi; Firouz
Rezazedeh; Sam Akindura; Edward Parlier; Luiz Azucena;
Lal Ith Gnanasiri; Yoav Portnoy; Boo H. Chung; Jeffrey H.
Kormann, Plaintiffs-Appellees,
v.
BP Oil, Inc., Defendant-Appellant.
Carlos HORCASITAS, Plaintiff-Appellee,
v.
BP OIL, INC., Defendant-Appellant.
 Nos. 87-3843(L), 87-3854 and 87-3855.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 7, 1988.
Decided Aug. 8, 1988.
Rehearing Denied Nov. 16, 1988.
 
 John Henry Lewin, Jr. (Arthur W. Machen, Jr., Venable, Baetjer & Howard, Baltimore, Md., on brief), for defendant-appellant.
 Harry Carl Storm (Abrams, West & Storm, P.C., Bethesda, Md., on brief), for plaintiffs-appellees.
 Before WIDENER, and CHAPMAN, Circuit Judges, and MICHAEL District Judge for the Western District of Virginia, sitting by designation only.
 CHAPMAN, Circuit Judge:
 
 
 1
 This case involves the nonrenewal of a petroleum retailing franchise. The district court, 652 F.Supp. 329 (D.Md.1987), ruled that defendant BP Oil Company (BP) was liable to its franchisee-retailer, Francisco Jimenez, for goodwill payments, construing the nonrenewal as a "termination" under the Maryland Gasohol and Gasoline Products Marketing Act ("the Act" or "the Maryland Act"), Md. Comm. Law Code Ann. Secs. 11-301 to -308 (1983). It also ruled that the Federal Petroleum Marketing Practices Act (PMPA), 15 U.S.C. Sec. 2801 et seq. (1982), does not preempt the Maryland Act. Although the district court said BP had not violated the PMPA, it did find that its nonrenewal of the Jimenez' franchise was a termination under the Act, entitling Jimenez to payment for goodwill. The court thus granted summary judgment to appellees on their claim for payments under the Act, but found for appellant BP on the issue of liability under the PMPA. We find that the PMPA preempted the Maryland Act under the facts of the instant case, and we reverse.
 
 
 2
 * Plaintiffs Jimenez, Horcasitas, and Palmer were multistation BP franchisees who operated in the Baltimore-Washington area pursuant to three-year franchise agreements. The franchises were scheduled to expire on April 30, 1985. For some time BP had been rethinking its decision to distribute petroleum products in that area. On April 18, 1985, it notified its plaintiffs that it would extend their franchises to October 31, 1985, and it would then determine whether it would remain in the local market and drop some less profitable distributorships, or whether it would completely exit the market. In September 1985 BP entered an agreement with Crown Central Petroleum Corporation ("Crown") by which Crown would purchase all of BP's Baltimore-Washington retail stations as of April 1, 1986. BP notified its franchisees of this agreement by letter dated October 17, 1985. BP then extended its franchises with plaintiffs through April 1, 1986, eleven months beyond the initially scheduled franchise expiration date.
 
 
 3
 Crown offered current BP franchisees franchises with terms less favorable than the BP franchise: particularly, Crown's prohibition of its franchisees operating more than one station. As a result, some of the BP franchisees, including plaintiffs, rejected offers of Crown franchises.
 
 
 4
 As planned, BP withdrew from the Baltimore-Washington market, and the Crown franchises with some of the former BP station owners became effective April 1, 1986. The plaintiffs brought an action on March 26, 1986 seeking a temporary injunction to prevent the termination of their BP franchises. They asserted that BP willfully violated the PMPA, and they sought goodwill payments under the Maryland Act. The United States District Court for the District of Maryland denied such relief.
 
 
 5
 Plaintiffs amended their complaint on July 18, 1986 and alleged that BP violated the PMPA, 15 U.S.C. Sec. 2802(b)(2)(E)(iii)(II), which provides that when a franchisor sells his interest in marketing premises, the purchaser must offer a franchise with terms and conditions "which are not discriminatory to the franchisee as compared to franchises then currently being offered" by the purchaser of seller's franchises. Plaintiffs reiterated their claim under the Maryland Act for goodwill payments as a result of the termination of their franchises.
 
 
 6
 The district court granted summary judgment for BP on the claims under the PMPA. It determined that the terms offered by Crown were nondiscriminatory and that BP's decision to exit the market was a "good faith" economic reason for termination or nonrenewal of their franchises. See 15 U.S.C. Sec. 2802(b)(2)(E).
 
 
 7
 The district court found for plaintiffs on their claims for goodwill under the Maryland Act. It found that the PMPA did not preempt the Maryland Act because the provisions of the state law as to goodwill payments upon franchise termination were not inconsistent with PMPA but were supplemental thereto. The court held that the instant case involved a termination rather than a "reasonable nonrenewal" for purposes of the Act and that plaintiffs were entitled to goodwill under the Maryland statute.
 
 
 8
 BP appeals. Its threshold argument is that the Act was intended to address wrongful conduct--unreasonable nonrenewals and terminations--rather than the instant situation: a complete withdrawal by an oil distributor from a geographic market. It also argues that the Federal PMPA preempts the Act's provision requiring goodwill payments for cancellation, termination, or unreasonable nonrenewal of retailing franchises. In the alternative, it argues that if goodwill payments are necessary, the Act's failure to establish a method for valuating goodwill gives the parties the ability to do so through their franchise agreement.
 
 II
 A. Applicability of the Maryland Act
 
 9
 It is well established that a court should avoid deciding a constitutional question when it can dispose of a case on another basis. Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Thus, before we decide BP's preemption claims under the Supremacy Clause, we must decide whether the district court properly found the Maryland Act applicable to the present facts. Turning to the Maryland statute, we think it unclear whether the Act covers complete market withdrawal as was accomplished by BP in the Baltimore-Washington area.
 
 
 10
 The Maryland statute seeks to prevent oil producers and refiners from forcing an independent retailer, who leases his station, to choose between either submitting to terms imposed by the company or losing his franchise. The effect of such maneuvering had been the vertical integration of producers into the retailing business. This, in turn, resulted in decreased competition, since there were fewer independent retailers to engage in price competition with company-operated stations. The Maryland Act was intended to remedy onerous supplier practices and price discrimination aimed at forcing independent retailers into a desired pricing line. See generally Governor of Md. v. Exxon Corp., 279 Md. 410, 418-22, 370 A.2d 1102, 1108-10 (1977); Comment, Gasoline Marketing Practices and "Meeting Competition" Under the Robinson-Patman Act: Maryland's Response to Direct Retail Marketing by Oil Companies, 37 Md.L.Rev. 323, 323-27 (1977).
 
 
 11
 The goodwill payment requirement of the Act, Md. Comm. Law Code Ann. Sec. 11-304(i), serves this purpose only when a producer seeks to force its way into the retailing market. BP is not seeking to capitalize on goodwill established by its independent retailers. There has been merely a substitution of franchisors--Crown for BP. Thus, we initially question whether the Maryland Act intended to operate as a "toll" to be paid by distributors seeking to exit a geographic market.
 
 B. Preemption of Maryland Law
 
 12
 Given the paucity of Maryland statutory or common law on whether the Maryland Act applies to market withdrawals, we will assume here that the Maryland legislature intended such. We thus move to the central issue: Whether the Maryland goodwill payment provision is preempted by the PMPA. We find that it is, at least insofar as it applies to complete market withdrawals.
 
 
 13
 The PMPA was enacted in 1978 in part to establish minimum federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel. S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S. Code Cong. & Admin. News 873 [hereinafter S.Rep.]. The main purpose of the safeguards of the PMPA was to combat termination and nonrenewal, or threats of termination and nonrenewal, that had been used by franchisors to compel franchisees to comply with marketing policies of the franchisor. S.Rep., supra, 1978 U.S. Code Cong. & Admin. News at 876. The Senate Report stated to this effect:
 
 
 14
 Needed is a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises and the notice which franchisors must provide franchisees prior to termination of a franchise or non-renewal of a franchise relationship. Such a set of rules would clearly define the rights and obligations of the parties to the franchise relationship in the crucial area of termination of a franchise or non-renewal of the franchise relationship.
 
 
 15
 S.Rep., supra, 1978 U.S. Code Cong. & Admin. News at 877.
 
 
 16
 The PMPA provides for preemption of certain state laws governing the same subject matter:
 
 
 17
 (a) To the extent that any provision of this subchapter applies to the termination (or furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.
 
 
 18
 15 U.S.C. Sec. 2806(a). The Maryland Act, on the other hand, provides in part as follows:
 
 
 19
 (i) Payment for goodwill.--(1) In addition to the provisions of subsection (h) of this section [requiring repurchase of products by distributor from terminated or cancelled franchisees], if, without the written consent of the dealer, the distributor terminates, cancels, or unreasonably refuses to renew the marketing agreement, the distributor shall pay the dealer the full value of any business goodwill which the dealer enjoys at the time he is notified of the termination, cancellation, or refusal to renew.
 
 
 20
 (2) The distributor shall make the payment required by the subsection within 30 days from the effective date of the termination, cancellation, or refusal to renew.
 
 
 21
 (3) This subsection does not apply if the dealer materially breaches the marketing agreement.
 
 
 22
 Md. Comm. Law Code Ann. Sec. 11-304(i).
 
 
 23
 Initially, we note that this court should be reluctant to determine that state law has been preempted by federal legislation, since " '[t]he exercise of federal supremacy is not lightly to be presumed.' " Tousley v. North Am. Van Lines, 752 F.2d 96, 101 (4th Cir.1985) (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Preemption of state law may be accomplished in several ways. As stated succinctly by the Supreme Court in Louisiana Public Service Commission v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986):
 
 
 24
 The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law. Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.
 
 
 25
 Id. at 368-69, 106 S.Ct. at 1898 (citations omitted). The central inquiry is whether Congress intended that federal regulation supercede state law with respect to the regulated subject matter. See id. at 369, 106 S.Ct. at 1898. BP asserts that Congress intended to supplant all state law and regulations governing the termination or nonrenewal of petroleum marketing franchises.
 
 
 26
 Jimenez argues that language from this court's decision in Barnes v. Gulf Oil Corp., 795 F.2d 358 (4th Cir.1986), supports its contention that no preemption of state laws regarding the "effects"--i.e., payment of goodwill--upon termination or nonrenewal of petroleum franchises was intended. Rather, it emphasizes that Congress' objective in enacting the PMPA was to establish " 'a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises.' " 795 F.2d at 364 (quoting S.Rep., supra, 1978 U.S. Code Cong. & Admin. News at 877) (emphasis added). We find this grounds/effects distinction unpersuasive in the present context and therefore conclude that the PMPA preempts Maryland's goodwill payment requirements in the instant case.
 
 
 27
 The Second Circuit utilized this grounds/effects distinction in Bellmore v. Mobil Oil Corp., 783 F.2d 300 (2d Cir.1986), in finding that the PMPA did not preempt a similar goodwill payment provision in the Connecticut Gasoline Dealer's Act. In Bellmore a plaintiff-franchisee declined a franchise renewal proposal by defendant-franchisor Mobil that nearly doubled his monthly rent for the franchise premises. Mobil thereafter informed Bellmore that his franchise would not be renewed. Bellmore then sought declaratory and injunctive relief under the PMPA, asserting violations of that Act in that Mobil's proposals were made neither in good faith nor in the normal course of business. 783 F.2d at 303. After such relief was denied, Bellmore amended his complaint to include a claim for the fair market value of his franchise, including goodwill, under the Connecticut Gasoline Dealer's Act, Conn.Gen.Stat. Sec. 42-133l (b). A jury awarded Bellmore $43,000 on his claims for goodwill under the Connecticut Act. Mobil appealed, contending the PMPA preempted the Connecticut Act on all issues related to the termination or nonrenewal of petroleum franchises. The Second Circuit affirmed, finding no preemption had been effected by the passage of the Connecticut Act. The court stated in part:
 
 
 28
 We cannot accept Mobil's argument that the payment of good will is a remedy or penalty for termination and thus preempted as not the same as the applicable provisions of the PMPA. The good will portion of the Connecticut Act is no more than a recognition of the good will value that Mobil would otherwise receive because of the efforts of the deposed franchisee. This payment of good will is not a penalty, as Mobil asserts, because Mobil is liable for the payment of such good will upon termination or nonrenewal "for whatever cause or reason except voluntary relinquishment or abandonment."
 
 
 29
 783 F.2d at 305 (quoting Conn.Gen.Stat. Sec. 42-133l (b)).
 
 
 30
 We find Bellmore unpersuasive here for four reasons. First, on its facts Bellmore did not involve a market withdrawal as was effected by BP in the instant case. Thus, the goodwill payment sought in the instant case may be more readily characterized as a penalty than could the payments sought in Bellmore.
 
 
 31
 Second, the Bellmore court, while emphasizing the need to protect franchisees against onerous producer practices, trivialized "the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based ... upon certain changes in circumstances." S.Rep., supra, 1978 U.S. Code Cong. & Admin. News at 877. The Senate Committee stated, "Particularly important is that legislation dealing with this subject recognize the importance of adequate flexibility so franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." Id.
 
 
 32
 Third, Bellmore's rationale is unpersuasive since it does not address the failure of the Connecticut Act (or the Maryland Act in this case) to take into account market withdrawals by franchisors. The PMPA, both in its legislative history, quoted above, and in its express provisions acknowledges the potential need for a franchisor to withdraw from a geographic market area and does not penalize it for doing so. See 15 U.S.C. Sec. 2802(b)(2)(E) (allowing withdrawal of franchisor from relevant geographic market area if done (i) in good faith and (ii) in the normal course of business); see also S.Rep., supra, 1978 U.S. Code Cong. & Admin. News at 891-93. Neither the Maryland Act nor the Connecticut Act recognize any special circumstance if the termination or nonrenewal is based upon a market withdrawal. Since market withdrawals without penalty are envisioned under the federal scheme, we find the Maryland provision, which in effect penalizes BP here in its attempt to withdraw from the Baltimore-Washington market, is preempted inasmuch as it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 
 
 33
 Last, unlike Bellmore, Jimenez and his fellow claimants are not "deposed franchisee[s]." Bellmore, 783 F.2d at 305. Here, Jimenez, et al., have been offered franchises with BP's successor Crown. Plaintiffs were offered a franchise at one location in accordance with Crown's policy of allowing its franchisees to operate only at one location. In addition, plaintiffs were offered the right to purchase the other locations they had operated. There has been no "deprivation" of goodwill by BP. Since BP is withdrawing from the area, it will not take with it nor benefit from any goodwill that plaintiffs may have developed. Any such goodwill remains with the plaintiff-franchisees. Further, this case does not involve the kind of attempts to compel franchisees to comply with onerous marketing policies established by franchisors as both the PMPA and the Maryland Act attempt to redress. See S.Rep. supra, 1978 U.S. Code Cong. & Admin. News at 876; Comment, supra, at 323-27.
 
 
 34
 In conclusion, both the statute and its legislative history address the preemptive effect of the PMPA. Section 2806(a) provides, "to the extent that any provision of this subchapter applies to the termination ... of any franchise, or to the nonrenewal ... of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination ... of any such franchise or to the non-renewal ... of any such franchise relationship unless such provision of such law is the same as the applicable provision of this subchapter." 15 U.S.C. Sec. 2806(a) (emphasis added). Similarly, the Senate Report provides, "The preemption provisions of the legislation are limited to provisions of State law dealing with termination or non-renewal of franchise relationships." S.Rep., supra, 1978 U.S. Code Cong. & Admin. News at 901 (emphasis added). The breadth of such language in our opinion evinces an intent by Congress to "occupy the field relating to termination and non-renewal of petroleum franchises." See Tousley v. North Am. Van Lines, supra, at 101.[1]III
 
 
 35
 We therefore conclude that plaintiffs are not entitled to payment by BP for accumulated goodwill, because the Maryland Act provisions requiring such payment are preempted by the PMPA. We agree, however, with the district court's conclusion that BP did not violate the PMPA, particularly 15 U.S.C. Sec. 2802(b)(2)(E), in withdrawing from the Baltimore-Washington market.
 
 
 36
 AFFIRMED IN PART; REVERSED IN PART.
 
 
 
 [1]
 Some courts have looked to Bellmore and its interpretation of the PMPA's preemptive power as extending only "to grounds for, procedures for, and notification requirements with respect to termination or non-renewal." Bellmore, 783 F.2d at 304; accord Consumers Petroleum Co. v. Texaco, Inc., 804 F.2d 907, 915 (6th Cir.1986); Mobil Oil Corp. v. Karbowski, 667 F.Supp. 927, 933 (D.Conn.1987). Arguably, if this court reads the preemption section of the PMPA as narrowly as those courts did, Jimenez might be correct in arguing that the goodwill payment provision of the Maryland Act might be spared from preemption since it does not govern the "grounds," "procedures," or "notification requirements" for termination. However, a literal reading of the PMPA, as noted above, reveals that it preempts "any provision of any [state] law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination." 15 U.S.C. Sec. 2806(a). This language is expressly broader than is the judicial gloss applied by Bellmore and courts following that decision. The statute, therefore, allows preemption under the instant facts. Cf. Atkins v. Chevron USA Inc., 672 F.Supp. 1373, 1378-79 (W.D.Wash.1987) (preempting goodwill payment provision under Washington's Franchise Investment Protection Act after determining that the provision was "inconsistent with the terms and purposes of the PMPA")