ARTHUR GLICK TRUCK SALES,
INC., Appellant,

v.

GENERAL MOTORS
CORPORATION, Appellee.

No. 121, Docket 88-7422.

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1988.
Decided Jan. 10, 1989.

Wayne Schneider (Helm, Shapiro, Anito & Aldrich, P.C., Albany, N.Y., Matthew E. Moloshok, Taub & Fasciana, New York City, on the brief), for appellant.

Daniel L. Goldberg (John R. Snyder, William N. Berkowitz, Andrea H. Maislen, Bingham, Dana & Gould, Boston, Mass., Barrington D. Parker, Jr., Morrison & Foerster, New York City, on the brief, Burton L. Ansell, General Motors Corp., Detroit, Mich., for appellee.

David E. Lehman, John S. Oyler, Stephen A. Moore, McNees, Wallace & Nurick, Harrisburg, Pa., for amicus curiae Nat. Auto. Dealers Assn.

William H. Crabtree, Edward P. Good, Motor Vehicle Manufacturers Ass'n of the U.S., Inc., Detroit, Mich., Charles H. Lockwood II, John T. Whatley, Auto. Importers of America, Inc., Arlington, Va., Stephen M. Shapiro, Kenneth S. Geller, Kathryn A. Oberly, Mayer, Brown & Platt, Washington, D.C., for amici curiae Motor Vehicle Mfrs. Ass'n of the U.S., Inc., and Auto. Importers of America, Inc.

Before OAKES, MINER and ALTIMARI, Circuit Judges.

OAKES, Circuit Judge:

This diversity suit was brought by a truck dealer against its franchisor for breach of contract and an alleged violation of the New York Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. Law §§ 460–471 (McKinney 1986).

The United States District Court for the Southern District of New York, John F. Keenan, Judge, considered the truck dealer's motion for a preliminary injunction, with affidavits submitted for and against the injunction. Finding a failure to establish irreparable injury and also that the dealer had failed to raise sufficiently serious questions going to the merits to make them a fair ground for litigation, the court denied the motion. The court then treated the franchisor's motion to dismiss under Fed.R.Civ.P. 12(b)(6) as one for summary judgment under Fed.R.Civ.P. 56 and granted summary judgment. We reverse the summary judgment and remand.

Arthur Glick Truck Sales, Inc. ("Glick") is a General Motors Corporation ("GMC") truck dealer in Sullivan County, New York, which sells three distinct types of trucks—light-duty, medium-duty, and heavy-duty trucks—under GMC franchise(s). Whether the franchise is singular or plural depends upon the merits of the case. Glick also has or had franchises from Kenworth and Mercedes–Benz for heavy-duty trucks. Glick has held GMC franchises for some time and received them most recently under a Dealer Sales and Service Agreement on November 1, 1985. Under the Agreement, General Motors grants Glick a right to buy new GMC truck motor vehicles "identified in the Motor Vehicle Addendum hereto" and to identify itself as an authorized GMC truck dealer. The dealer agrees to sell and service GMC trucks and to build and maintain consumer confidence and to establish and maintain satisfactory premises. While the Agreement refers to the "Motor Vehicle Addendum" in the singular, there are four separate addenda attached to the Agreement, one covering light-duty trucks and school buses; two covering medium-duty trucks of different models; and the fourth covering heavy-duty trucks, including the J8000 and J9500 Brigadier models, the N9500 General models, and the D9500 Astro models.

The heavy-duty truck Addendum states that it shall "remain in effect unless cancelled or until superseded by a new Motor Vehicle Addendum furnished Dealer by GMC Truck." It is signed by GMC Truck Operation and dated November 7, 1986. There are provisions in the Dealer Sales and Service Agreement by which General Motors reserves the right to "change the Motor Vehicle Addendum by furnishing Dealer a superseding Motor Vehicle Addendum" (Article 1.1.1) as well as the right to "discontinue any Product at any time and its only obligation shall be to manufacture and deliver to Dealer accepted orders which Dealer does not elect to cancel." (Article 1.5.) The termination provisions (Article 4) permit termination of the Agreement by the dealer by written notice to General Motors; termination by agreement of both; termination by either in the event the other fails to secure or maintain any necessary license required for the performance of the agreement; and termination by General Motors for failures on the dealer's part, such as incapacity, failure of performance, attempted sale or transfer of the dealership, refusal to furnish sales and service or financial information, engaging in unfair or deceptive business practices, insolvency, and the like.

On September 10, 1986, GMC Truck Corporation wrote to all of its dealers, including Glick, concerning a proposed joint venture between Volvo White and General Motors. The letter stated that not every GMC truck dealer would be selected to be a part of the new joint venture, but it encouraged every dealer to work hard and continue to give sales and service to the large GMC truck owner base. Dealers' sales and service performance would be among the criteria used by the joint venture to select its dealers.

GMC Truck Corporation then wrote to Arthur Glick Truck Sales on December 23,

1986, announcing that an agreement to form the joint venture had been signed and that Volvo GM Heavy Truck Corp. would be formed as of January 1, 1987. The result would be that GMC Truck "will cease offering heavy duty truck products for sale in North America on December 31, 1987" and "the GMC Truck Operation Motor Vehicle Addendum to General Motors Corporation Dealer Sales and Service Agreement for new Heavy Duty Truck Motor Vehicles will expire as of December 31, 1987." The letter added that the remaining Motor Vehicle Addenda and the Dealer Sales and Service Agreement would not be affected. Thus, a dealer such as Arthur Glick, with addenda covering light-duty trucks, medium-duty trucks, and heavy-duty trucks, could continue to act as a dealer for the light- and medium-duty trucks, even after the "expiration" of the heavy-duty truck addendum.

On July 6, 1987, Volvo GM Heavy Truck Corporation notified Glick that it would not offer Glick a dealership for the heavy-duty trucks to be manufactured and distributed by it after January 1, 1988.

GMC Truck Corporation sent Glick a similar letter the same day, informing the dealer that it would not be offered a dealership for the joint venture. The letter also stated that GMC would offer Glick the same assistance provided under the Dealer Sales and Service Agreement for terminations, namely buying back new, unused, and unsold Brigadiers, Generals, and Astros, repurchasing signs, tools, parts, and accessories, and the like. Accompanying the letter was an "ACCEPTANCE OF BENEFITS AND RELEASE OF RELATED CLAIMS" to be signed by the dealer wishing to avail itself of the termination assistance; this attachment, if signed, would release General Motors from any and all claims related to the cancellation of the heavy-duty addendum.

Glick did *not* execute the acceptance of benefits and release. Instead, Glick sued GMC December 18, 1987, alleging, inter alia, that General Motors was continuing to manufacture its Brigadier heavy-duty truck and market it through the joint venture under the trade name "White GMC." One of the affidavits submitted in support of Glick's motion for a preliminary injunction included an excerpt from *Automotive News* for January 25, 1988, quoting General Motors officials as saying that Brigadier sales in 1987, amounting to 52,227 units, accounted for 71.52% of General Motors' Class 8, i.e., heavy-duty, truck sales. Glick also submitted an extract from the testimony of General Motors' Director of International Strategy Development, Truck and Bus Group, stating that the Brigadier had been very successful and achieved more than a 30% share of its segment of the heavy-duty truck market.

Arthur Glick's affidavit accompanying the request for a preliminary injunction indicated that his company had been a retail dealer of General Motors trucks since 1968 and in 1986 had high performance ratings, and that the sale of heavy-duty trucks and associated revenue from financing and used truck trade-ins contribute significantly to the company's revenues, such parts and service representing over half of Glick's parts and service revenue. Todd Glick stated in his affidavit that for ten months in 1987 approximately 24% of Glick's gross profits came from selling and servicing General Motors heavy-duty trucks. Another affidavit pointed out that General Motors continues to manufacture the Brigadier at its Pontiac, Michigan, plant in response to orders from the joint venture and plans to do so until at least January 1, 1989.

The district court, in its summary judgment decision against Glick, held that no "franchise" had been terminated, despite the fact that the statute defines a franchise as "a written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a franchised motor vehicle dealer a license to use a trade name, service mark or related characteristic." N.Y.Veh. & Traf. Law § 462(6) (McKinney 1986). Rather, said the district court, "[w]hat took place here was that a manufacturer opted to discontinue a product line, and put its efforts for that line into a joint venture with another entity." The fact that General Motors owns a share

in a separate corporation that now manufactures heavy-duty trucks does not change the result. Since no franchise was terminated, the New York Franchised Motor Vehicle Dealer Act was not violated, and since Article 1.5 of the Dealer Sales Agreement permits discontinuance of a product line at any time, there was no breach of contract. The court's opinion did not mention that General Motors was continuing to manufacture its Brigadier trucks for the joint venture and marketing them under a different logo.

We note further that the Brigadier, which evidently accounted for over 70% of General Motors' heavy-duty truck sales in 1987, is not simply a single model, but has four basic types, two of them with a smaller engine and either single or tandem rear axles, and two of them with a larger engine and either single or tandem rear axles. We also note that of General Motors' 2,427 truck dealers, 2,145 dealers were light- and/or medium-duty only, 85 were heavy-duty only, and 197 (such as Glick) were full line, that is to say, carrying light-, medium-, and heavy-duty trucks.

## DISCUSSION

■ We believe that Glick is entitled to discovery and trial if necessary to determine whether the heavy-duty truck line was a separate franchise, whether General Motors terminated Glick's franchise without due cause, and whether General Motors breached its contract with Glick.

The district court decided that no franchise had been terminated. Its analysis was purely economic, saying that the statute does not require franchisors to continue to manufacture products that are no longer profitable and that to apply the New York statute to a corporation's decision to cease production of a particular line in order to cut losses would have a perverse economic result and would be a roadblock to the natural flow of commerce, preventing businesses from running in an economically efficient fashion. There was no analysis of the attributes of a franchise under New York's Franchised Motor Vehicle Dealer Act and of whether heavy-duty

trucks might constitute a separate franchise. Nor did the court take note of the fact that General Motors continues to manufacture the Brigadier truck and distribute it through a new network of dealers established by the joint venture.

But here there may have been a "community of interest in the marketing of" heavy-duty trucks and related services. *See* N.Y.Veh. & Traf. Law § 462(6) (McKinney 1986). There was a written arrangement for a definite period during which General Motors granted the Glick dealership a license to use its trade name, service mark, or a related characteristic. Heavy-duty trucks are a significant segment of the market, calling for a separate addendum to the Dealer Sales and Service Agreement. The heavy-duty truck Addendum itself says that it shall remain in effect "unless cancelled or until superseded by a new Motor Vehicle Addendum furnished Dealer by GMC Truck." Surely as to those eighty-five or so dealers who had only the heavy-duty truck line, that is a franchise. Should it be different for the dealers like Glick who carried the full line? It is significant, too, that Glick's territory for the sale of heavy-duty trucks differed from its territory for other trucks.

■ Where a dealer has made an investment in parts and training service employees and where the line of trucks is functionally related to a distinct segment of the market, as heavy-duty trucks appear to be, and where their sale constitutes a substantial part of the dealer's revenues, it may be that the dealer has been given a "franchise." Other district court cases have so held, under different statutes but on similar facts. *Central GMC, Inc. v. General Motors Corp.,* No. R-88-263, (D.Md. May 5, 1988); *Mid-State Truck Service, Inc. v. General Motors Corp.,* No. 87-C-995-S (W.D.Wis. Mar. 28, 1988) [1988 WL 148432]. *See also C-B Kenworth, Inc. v. General Motors Corp.,* 706 F.Supp. 952 (D.Me.1988) (question of separate franchise a factual issue that cannot be resolved on documents submitted on summary judgment motion); *In re General Motors Corp. and Volvo*

*White Truck Corp.*, No. 8760 0812 (finding by Pennsylvania Board of Vehicle Manufacturers, Dealers and Salespersons, Dec. 17, 1987, that heavy-duty product addenda may be treated as franchises).

Moreover, GM has not withdrawn completely from the heavy-duty truck business. It continues to manufacture the Brigadier, a successful product so far as appears on the state of this record. Indeed, it is more than just a share-holder in the joint venture with Volvo. The joint venture's name, Volvo GM, guarantees that the GM trademark will remain visible, as Judge Ramsey found in *Central GMC, supra.* General Motors has retained a percentage of control and has a market for its current production of Brigadiers.

█ General Motors argues that Glick's claim under the New York statute is time-barred because Glick did not bring an action within 120 days after GM first indicated it would terminate the heavy-duty truck franchise. *See* N.Y.Veh. & Traf. Law § 463(2)(e) (McKinney 1986). We think that the applicability of the statutory time constraint should be determined by the district court only after a decision that there was a franchise.

If the heavy-duty truck line was indeed a franchise, and if the action under the Act was timely commenced, we conclude that there remain genuine issues of material fact as to whether GM terminated Glick's franchise without due cause in violation of New York Vehicle & Traffic Law § 463(2)(d)(1). We leave it to the district court to determine whether the reasons given by GM for terminating Glick's dealership in heavy-duty trucks constitute due cause.

█ On the breach of contract claim, we agree with Glick that Article 1.5 of the Agreement could be a means of circumventing Article 4's termination provisions: If there were a single Addendum attached to the Agreement, discontinuance of the models covered by that Addendum would, effectively, terminate the entire Agreement. This would contradict the plain language of the contract and render Article 4 meaningless. (It is significant in this context that roughly one-third of GM heavy-duty truck dealers sell *only* heavy-duty GM trucks.) Glick has, at the very least, raised a genuine issue of material fact as to whether Article 1.5 of this form document permits discontinuance of individual models but not of entire product lines.

General Motors argues that if Glick's reading of the contract were accepted, GM "would be forever frozen in its model choices unable to respond to market conditions and changing consumer demands." However, General Motors' obligation is only for five years, GM continues to manufacture its popular Brigadier model, and it appears that General Motors may have appropriated via the joint venture the heavy-duty truck dealers' rights. This could support a claim for breach of contract without the need for any interpretation of Article 1.5, but we leave the entire matter in the hands of the district court.

JUDGMENT REVERSED AND CAUSE REMANDED.