FREEDMAN TRUCK CENTER,
INC., Plaintiff,

v.

GENERAL MOTORS CORPORATION,
et al., Defendants.

Civ. No. 91–4991 (HLS).

United States District Court,
D. New Jersey.

Feb. 14, 1992.

Marvin J. Brauth, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for plaintiff.

Michael S. Waters, Carpenter, Bennett & Morrissey, Newark, N.J., for defendants.

Daniel L. Goldberg, Bingham, Dana & Gould, Boston, Mass.

## OPINION

SAROKIN, District Judge.

Before the court is defendant's motion to dismiss Counts I, II, III, IV, V, VI & IX of the Complaint.

*Background*

This case concerns the relationship between defendant General Motors Corporation ("GM") and its franchisee, plaintiff Freedman Truck Center, Inc. ("Freedman"). Since 1936, Freedman, a truck dealership, has sold and serviced trucks manufactured by GM pursuant to franchise agreements called Dealer Sales and Service Agreements ("the Dealer Agreement"). An addendum, modified from time to time ("the Motor Vehicle Addendum") identified the truck models marketed by GM available to its truck dealers.

At least until January 1, 1988, GMC manufactured light, medium and heavy duty truck lines. The scope of the franchise held by Freedman is at issue in this case. However, it is not disputed that Freedman was permitted to and did sell GM's heavy duty trucks, pursuant to a Motor Vehicle Addendum ("the Heavy Duty Addendum"). On November 1, 1985, Freedman entered into a new Dealer Agreement with GM, under which Freedman continued to sell heavy duty trucks, among other GM products.

In the fall of 1986, GM entered into a joint venture with various affiliates of AB Volvo, the Swedish manufacturer ("Volvo"), which was named the Volvo GM Heavy Truck Corporation ("Volvo GM"). According to defendants, pursuant to GM's agreement with Volvo, Volvo GM began marketing heavy duty vehicles effective January 1, 1988. Def. Mem. at 4. However, GM continued to produce its "Brigadier" model for one year—1988—as a subcontractor to Volvo GM; these trucks were sold by Volvo GM under its own name and warranty to its own dealers. Defendant represents in its moving papers that all production of the Brigadier had ceased by December 16, 1988. Def. Mem. at 4, n. 5.

According to Freedman, as a result of the joint venture, which assumed all the truck marketing functions of GM and Volvo, GM canceled Freedman's Heavy Duty Addendum "and thereby terminated Freedman's heavy duty truck franchise effective December 31, 1987." Plaintiff Mem. at 3. This "termination" is the basis for the present suit. On October 4, 1991, Freedman instituted this action, seeking damages for wrongful termination of its franchise, breach of the Dealer Agreement, breach of implied covenants of good faith and fair dealing, and fraud. Freedman claims that GM was only permitted, under

New Jersey's Franchise Practices Act, to terminate its franchise for "good cause," and that GM failed to honor this standard.

According to GM's moving papers, GM decided to enter into the joint venture because of "persistent losses" in all of its truck lines:

> In 1986 [GM] made the business decision to discontinue on a nationwide basis four truck models, commonly referred to as "heavy duty" trucks, ... rather than liquidate its heavy duty truck assets GM contributed some of those assets and cash to a joint venture with Volvo ... in return for a minority (24%) stock interest. [GM] dealers, along with former dealers for Volvo products, received preference in the selection of dealers by the new entity. Thus, by contributing some assets to Volvo GM, [GM] salvaged a part of its own investment in the heavy duty business as well as an opportunity for many of its dealers. However, not all [GM] dealers could receive a Volvo GM agreement. Freedman was one which did not.

Def. Mem. at 2, 4. As a result of its decision to discontinue the four heavy duty models, GM purportedly canceled the Motor Vehicles Addendum listing those models effective January 1, 1988. Def. Mem. at 5. GM claims that Freedman had been notified of this impending action by December of 1986. GM contends that pursuant to the Dealer Agreement, Freedman retains the ability to purchase those products which continue to be marketed by GM. GM further argues that it merely discontinued models, as it was expressly permitted to do under the Dealer Agreement, and that Freedman continues to be a fully authorized GM dealer.

### Discussion

For the purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court must take all facts alleged in the Complaint as true, and must only dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Scheuer v.*

*Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

In its complaint, plaintiff alleges that GM's "termination" of Freedman's "heavy duty truck franchise" without "good cause" violated the New Jersey Franchise Practices Act (Count I); that, in the alternative, the cancellation of the Motor Vehicle Addendum for heavy trucks constituted the "partial termination" of plaintiff's franchise (Count II); that cancellation of the Motor Vehicle Addendum is contrary to the common law and public policy of New Jersey (Count III); that by canceling the Heavy Duty Addendum, GM breached its Dealer Agreement (Count IV); that the course of conduct between the parties prevented GM from discontinuing its heavy duty models (Count V); that GM has breached implied covenants of good faith and fair dealing (Count VI); and that GM failed to comply with the requirements for termination assistance under the Dealer Agreement (Count IX). The court will consider defendant's arguments for dismissing each of these counts in turn.

### New Jersey Franchise Practices Act

The New Jersey Franchise Practices Act ("NJFPA") states that:

> It shall be a violation of this act for a franchisor ... to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

N.J.S.A. § 56:10–5. Plaintiff contends in its first count that GM's alleged termination of Freedman's "heavy duty truck franchise" without good cause violated this provision.

Defendant argues that plaintiff's claim must fail because its franchise has not been terminated: only the Heavy Duty Addendum was terminated and this, defendant urges, is not a "franchise" within the meaning of N.J.S.A. § 56:10–5. Defendant also states that public policy and the statute's legislative purpose support a fran-

chisor's ability to discontinue products without violating the terms of the statute.

The court observes that it does not write on a blank slate in addressing this issue: GM's "decision to withdraw from the heavy duty truck market has given rise to numerous actions nationwide" and contradictory interpretations of essentially similar factual and legal questions. *General Motors Corp. v. Gallo GMC Truck Sales*, 711 F.Supp. 810, 817 (D.N.J.1989). The results are mixed: one court has held that heavy duty addenda similar to the one at issue in this case may constitute an independent franchise. *Arthur Glick Truck Sales, Inc. v. General Motors Corp.*, 865 F.2d 494 (2d Cir.1989) (New York statute). Other courts have come to precisely the opposite conclusion, holding that Dealer Agreements constituted only one franchise, regardless of the number of addenda, *Central GMC, Inc. v. General Motors Corp.*, 946 F.2d 327 (4th Cir.1991) (Maryland statute), *petition for cert. filed*, No. 91–1103 (Jan. 6, 1992); *Mid–State Truck Service v. Volvo Heavy Truck Corp. & General Motors Corp.*, 894 F.2d 1339 (7th Cir.1990) (Wisconsin statute), and that termination of a product line pursuant to general market withdrawal does not violate statutes protecting the rights of franchisees. *Capital GMC Trucks, Inc. v. Commissioner of Department of Motor Vehicles*, No. 1417–88–2 (Va.App.Ct. Dec. 5, 1989) (Virginia statute); *Carolina Truck & Body Co. v. General Motors Corp.*, 102 N.C.App. 262, 402 S.E.2d 135 (1991), *cert. denied*, 329 N.C. 266, 407 S.E.2d 831 (1991) (North Carolina statute). In the only published opinion within this circuit interpreting the NJFPA in this context, the district court fell into the former camp, finding that the Heavy Duty Addenda was a separate franchise which GM had terminated by the actions culminating in its entry into the Volvo joint venture, and that market withdrawal does not constitute "good cause" for termination of such a franchisee. *General Motors Corp. v. Gallo GMC Truck Sales*, 711 F.Supp. 810 (D.N.J.1989) (*citing Frank's GMC Truck Center, Inc. v. General Motors Corp.*, No. 87–4839 (D.N.J. Jan. 7, 1988), *rev'd on other grounds*, 847 F.2d

100 (3d Cir.1988)). Since none of these decisions represents controlling authority on point, the court will proceed to consider the merits, guided by the analysis of case law, statutory provisions, and legislative intent appearing in these many well-reasoned opinions.

■ This court begins with the question of whether termination of a franchise, where one indisputably exists, violates the NJFPA if termination occurs in the context of a general market withdrawal by the franchisor. The court finds no authority that directly resolves this problem of New Jersey statutory interpretation. Considering the same issue, of the applicability of the NJFPA to a case of market withdrawal, the Third Circuit concluded:

> We have examined the legislative history of the Act and do not find it decisive on this question of interpretation. Witnesses who testified in support of the bill expressed concern about capricious action by franchisors, coercive uses of the threat of termination to impose onerous burdens on franchisees and refusal to renew one successful franchise in order to give that business opportunity to a more favored entrepreneur. Certainly, these were the problems and conceived injustices upon which legislative attention focused. We have found nothing to indicate whether the legislature even considered such a problem as this case presents, much less whether the statute was intended to imply so comprehensively.

*Consumers Oil Corp. v. Phillips Petroleum Co.*, 488 F.2d 816, 819 (3d Cir.1973) (abstaining from deciding application for emergent relief on uncertain state law ground).

Both plaintiff and the *Gallo* court rely on the New Jersey Supreme Court's decision in *Westfield Centre Service, Inc. v. Cities Service Oil Co.*, 86 N.J. 453, 432 A.2d 48 (1981). *Westfield* concerned the termination of a gasoline service station franchise by a gasoline company that also leased the property on which the station was located to the franchisee. The franchisor's stated reason for terminating the

franchise was its conclusion that a gasoline station at that location was not economically feasible, and its determination that it was over-invested in real estate. *Id.* at 459–60, 432 A.2d 48. After studying the economics of its service station network in New Jersey and appraising the market value of its property, the franchisor determined to terminate certain franchises and retain others. Plaintiff's station fell in the former category: defendant terminated the franchise, refused to renew the lease, and put the property on the market.

The *Westfield* franchisor contended that it had good faith bona fide economic reasons for ending the franchise and that the NJFPA allowed termination in such circumstances. Interpreting the NJFPA and its legislative history, the Supreme Court rejected the franchisor's argument:

> The economic effect of compensating the franchisee for the reasonable value of its business when balanced against the evil that the Legislature sought to eliminate is a reasonable accommodation of the rights of the franchisor and the general public in franchise arrangements.... we hold that a franchisor who in good faith and for a bona fide reason terminates, cancels or fails to renew a franchise for any reason other than the franchisee's substantial breach of its obligations has violated N.J.S.A. 56:10–5 and is liable to the franchisee for the loss occasioned thereby, namely, the reasonable value of the business less the amount realizable on liquidation.

*Westfield*, 86 N.J. at 469, 432 A.2d 48 (citations omitted). The court further concluded that, while an injunction requiring a franchisor to retain a franchisee could raise constitutional due process concerns, a requirement that a franchisor compensate a terminated franchisee had no such constitutional infirmity. *Id.*

While agreeing with the *Westfield* court's analysis of the purpose and meaning of the NJFPA, this court fails to find in *Westfield* authority for the proposition that compensation is required under the NJFPA for every market withdrawal. In *Westfield*, the franchisor had not left the franchise business or discontinued its products; rather, it exploited its superior bargaining position to maximize its return on the property the franchisee occupied, without compensating the franchisee for the going concern value of its business. The franchisor's actions served its own interests at the expense of a franchisee, and were discriminatorily directed at a particular franchisee—other franchisees continued to receive the franchisor's products. Most important, because other franchisees remained in business, the franchisor was able to appropriate the goodwill in which the terminated franchisee had invested with no compensation for its efforts on behalf of the franchised product.

Such abuse of the franchise relationship is exactly the type of situation the NJFPA was meant to remedy. The *Westfield* court simply did not consider the circumstance in which a franchisor withdraws entirely from the business of manufacturing and marketing the franchised product uniformly across a geographical area. Where a franchisor and all its franchisees are both suffering from the declining fortunes of an industry, such market withdrawal may have none of the exploitative implications of the franchisor's actions in *Westfield*. This court, therefore, concludes that the *Westfield* holding does not dispose of the claims raised in the present suit.

The court instead takes its guidance from the "evil the Legislature sought to eliminate" as identified by the *Westfield* court: abuse of the franchise relationship through the franchisor's stronger bargaining position. As the district court said in *Gallo:*

> The [NJFPA] reflects the legislative concern over longstanding abuses in the franchise relationship.... The legislature recognized the franchisor's superior bargaining position in the franchise relationship, and "the inevitable intertwining of the franchisee's livelihood with the franchise." ... Despite their common interest in the success of the franchise, the franchisor and the franchisee also have vastly divergent interests. As long as the franchisor benefits from the increased public exposure and distribution

of its goods, it matters little to the franchisor whether a particular franchisee remains in business, as there will always be another franchisee available to take that place in the distribution network.... Once a franchisee has succeeded, through the expenditure of his own efforts and capital, to establish a local reputation for the franchise name, his franchise is vulnerable to termination.... It is the potential for abuse attendant upon an arbitrary and uncompensated termination of a franchise which the Franchise Practices Act was intended to address.

*Gallo*, 711 F.Supp. at 814.

The court finds the possibility for the type of abuse identified in *Gallo* and *Westfield* largely absent from a full-scale market withdrawal. When a franchisor withdraws entirely from a market, it cannot appropriate the goodwill of a terminated dealer by diverting its business to favored franchisees. Nor is there a risk here of the franchisor driving an unconscionably hard bargain: there is simply no bargain to be made. In the context of a failing product prompting market withdrawal, the interests of franchisor and franchisee could diverge somewhat: there could be greater profit in the franchisee's business, which it was unable or unwilling to pass on to the franchisor; or franchisees, whose livelihood is often closely tied to their businesses, might be willing to continue to operate at lower margins of profitability than large corporate franchisors, with more attractive investment alternatives, would be willing to tolerate. But in general, the direct conflicts of interest present in discriminatory franchise termination are absent when a franchisor elects to exit a market.

In such a situation, a requirement that the franchisor compensate franchisees upon termination would serve a different role: not preventing exploitation of greater bargaining power, but shifting the risk of economic downturn, in an industry as a whole or in a particular companies' products, whether due to increased competition, decreased quality, or some other cause, from the franchisee to the franchisor. Such a requirement, in other words, would make franchisors insurers for franchisees. While it would be incorrect to say that such an arrangement is necessarily irrational,[1] the court concludes that, based on the paucity of evidence in the legislative record of any intent to effect such a shifting of risk, the NJFPA does not mandate it.

The court concludes, based on the legislative record, that the New Jersey Supreme Court, if confronted directly with the issue, would agree with those courts that have held that franchise statutes similar to New Jersey's do not impose liability on a franchisor who "makes a nondiscriminatory product withdrawal over a large geographic area." *St. Joseph Equipment v. Massey–Ferguson, Inc.*, 546 F.Supp. 1245, 1248 (W.D.Wis.1982) (interpreting Wisconsin Fair Dealership Law). As a North Carolina court stated in reviewing its own state's franchisee protection legislation:

> We cannot conceive that the Legislature would enact a statute prohibiting a manufacturer from canceling a franchise agreement if it determined to stop manufacturing that product because it was unprofitable.... Clearly, the Legislature does not require a manufacturer to continue on a road to certain bankruptcy by requiring the manufacturer to continue to make and sell unprofitable models of cars or trucks.

*Carolina Truck & Body*, 102 N.C.App. 262, 402 S.E.2d 135. *See also Jimenez v. BP Oil, Inc.*, 853 F.2d 268 (4th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); *Medina & Medina v. Country Pride Foods, Ltd.*, 858 F.2d 817, 824 (1st Cir.1988) (certified to P.R.Sup. Ct.) (Puerto Rico Dealer's Act does not prohibit supplier from withdrawing from the market); *American Mart Corp. v. Joseph E. Seagram & Sons, Inc.*, 824 F.2d 733, 734 (9th Cir.1987) (per curiam) (upholding termination of dealer pursuant to nationwide plan of reorganization); *cf.* 15

---

**1.** Familiar "least-cost avoider" arguments could support assigning risks to franchisors, who may be in a better position both to identify and spread risks and to take steps to insure the continued economic health of their product offerings.

U.S.C. § 2802(b)(2)(E) (under Petroleum Marketing Practices Act, no liability is incurred by a franchisor who determines "in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area").

In reaching this conclusion, the court rejects the holding of the *Gallo* court. In contrast to *Gallo's* reading of state case law, no New Jersey court has gone so far as to say that a case of market withdrawal, pure and simple, violates the NJFPA. In a case of market withdrawal, the potential or exploitative appropriation of a franchisee's efforts and capital in establishing a local reputation for the franchise does not exist. *See Gallo*, 711 F.Supp. at 814. Accordingly, this court need not address the constitutional question of whether the burden in prohibiting franchise termination pursuant to market withdrawal without compensating terminated franchisees would violate the Commerce Clause. *See id.* at 819–20. Further, since even termination of an explicit and unquestionable grant of a franchise pursuant to a market withdrawal would not violate the NJFPA in the court's view, no termination of a Heavy Duty Motor Vehicle Addendum in similar circumstances—whether or not it constitutes a franchise—could do so.

■ This conclusion, however, does not end the matter, due to two factual issues concerning the manner in which GM exited the New Jersey market. First, Freedman alleges that GM continued to produce its "Brigadier" truck one year after it ceased distributing it to plaintiff. GM admits that during that year it offered its truck to some but not all former franchisees in the same geographic territory, thereby discriminating between its dealers. No argument made by GM to this court has established that GM did not thereby maintain its presence in the market with respect to at least one of the vehicles listed on the Heavy Duty Addendum. Therefore, if this Addendum constituted a franchise, the alleged continued production of the Brigadier would raise a triable issue of fact concerning whether GM had terminated Freedman's heavy duty truck "franchise" on a discriminatory basis, without good cause and without the defense of general market withdrawal.

■ Second, an issue of potentially greater ramifications is raised by plaintiff's claim that despite GM's withdrawal from manufacture of heavy duty trucks, it continued its "market presence" through the joint venture. The *Gallo* court described the transaction in which the Volvo–GM joint venture was formed in detail:

> GMC would no longer market heavy duty trucks under the GMC Truck tradename, but would transfer certain operating assets and cash into the joint venture, and receive in return a 24% interest in Volvo GM and three seats on its ten-member board of directors. Thereafter, all GMC heavy duty trucks would be manufactured and marketed by Volvo GM under the trademark "White GMC."

*Gallo*, 711 F.Supp. at 812. As the Second Circuit found, this arrangement made GM "more than just a share-holder in the joint venture with Volvo. The joint venture's name, Volvo GM, guarantees that the GM trademark will remain visible...." *Glick*, 865 F.2d at 498. Indeed, if the trademark employed by the joint venture were the one described in *Gallo*, GM's name would assume more prominence in the public's eye than Volvo's.

The continued survival of GM's tradename, despite GM's "withdrawal" from the market and its cessation of manufacturing, raises the possibility that GM has effected precisely the sort of appropriation of goodwill earned by its franchisees that the NJFPA was designed to prevent. This perception is reinforced by the undisputed fact that after completion of the joint venture, new franchises for Volvo GM products were extended to some, but not all, former GM franchises. To the extent that the chosen franchisees sold substantially the same products to substantially the same markets with which GM franchisees had formerly done business, and thereby derived a benefit from goodwill already associated with the GM name, they would be free-riding on the efforts of all former GM

franchisees, including the terminated ones, in building a market for GM heavy duty trucks.[2] Such an uncompensated appropriation of the labor and capital of terminated franchisees would be made possible by the superior bargaining position of the franchisor. In the view of this court, such a consequence of franchise termination, were it to have occurred, would constitute a violation of the NJFPA and entitle the terminated franchisee to remedies under that statute.

■ Defendants raise the further threshold defense that the NJFPA, interpreted as prohibiting "good faith" termination of franchisees for economic reasons, is preempted by the Automobile Franchise Dealers Act ("AFDA"), 15 U.S.C. § 1221, *et seq.* The AFDA provides that:

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce ... and shall recover the damages by him sustained ... by reason of the failure of said automobile manufacturer ... to act in good faith ... in terminating ... the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

15 U.S.C. § 1222.

It is beyond dispute that Congressional intent to preempt state law is not to be "lightly presumed." *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S.

272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). "Proper respect ... for the independent sovereignty of the several States requires that federal supremacy be invoked only where it is clear that Congress so intended." *Penn Terra Ltd. v. Dept. of Environmental Resources*, 733 F.2d 267, 273 (3d Cir.1984). Therefore, statutes should be construed to avoid preemption "absent an unmistakable indication to the contrary." *Id.*

In this respect, the court finds the reasoning of the *Gallo* court persuasive: there is no "unmistakable indication" of preemption in evidence here. *Gallo*, 711 F.Supp. at 820–22. The AFDA explicitly sets forth that it was intended to invalidate state law only "insofar as there is a direct conflict between an express provision of this chapter and an express provision of State law which can not be reconciled." 15 U.S.C. § 1225. No such "direct conflict" is present here. As the court reads the federal statute, the AFDA merely provides automobile dealers a cause of action when a manufacturer fails to act in good faith in terminating a contract; it does not say that a dealer cannot bring suit, based on a state cause of action, in the absence of a showing of bad faith by the manufacturer.[3] The NJFPA provides a higher level of protection, above the floor established by the AFDA. There is no "direct conflict" between two such provisions, such as is required to trigger preemption under the AFDA.[4] Accordingly, the court holds that

2. GM's minority position in the new joint venture cannot absolve it from responsibility in this regard. GM was responsible for the decision to terminate its own franchisees, and hence can be held accountable for burdens imposed on them by the termination, regardless of the fact that it was the new entity, in which GM held only a minority stake, that decided which franchisees to retain as GM–Volvo dealers. GM could have protected its franchisees in its joint venture agreement and cannot be absolved by reason of its failure to do so.

3. The statute further provides that a showing of bad faith by a dealer is a defense to the franchisor; but this is, of course, irrelevant, to determining the defenses of which a franchisor can avail itself.

4. GM cites no case reading the scope of AFDA preemption as broadly as it urges. *Gallo*, 711

F.Supp. at 821. Defendants rely largely on *Jimenez v. BP Oil, Inc.*, 853 F.2d 268 (4th Cir.1988), for their preemption claim. However, this case interprets the Petroleum Marketing Practices Act ("PMPA"), not the AFDA. Unlike the AFDA, the PMPA explicitly allows termination pursuant to a good faith business decision to withdraw from a market. 15 U.S.C. § 2802(b)(2)(E). Further, the PMPA contains broader preemption language than does the AFDA: the PMPA preempts any state law or regulation not "the same as" the federal law. 15 U.S.C. § 2806(a); *see Jimenez*, 853 F.2d at 271; *cf. Bellmore v. Mobil Oil Corp.*, 783 F.2d 300 (2d Cir.1986) (concluding, *contra Jimenez*, that the PMPA did not preempt a goodwill payment provision in the Connecticut Gasoline Dealer's Act). Based on its analysis of the PMPA, the *Jimenez* court concluded that a claim under a state franchise statute for termination pursuant to market with-

the NJFPA, as applied herein, is not preempted by the AFDA.

 The court, therefore, must address the question of whether a franchise for heavy duty trucks in fact existed. Defendants contend that they are immune from liability in any case, since the Dealer Agreement constitutes the only franchise plaintiffs ever possessed, and that Agreement remains in force despite the termination of the Heavy Duty Addendum. Plaintiffs argue that the Heavy Duty Addendum, coupled with the Dealer Agreement, forms a separate franchise, capable of independently supporting a claim under the NJFPA.

The NJFPA defines "franchise" as follows:

Franchise means a written arrangement for a definite or indefinite period in which a motor vehicle franchisor grants a right or license to use a trade name, trademark, service mark or related characteristics in which there is a community of interest in the marketing of new motor vehicles at retail, by lease agreement or otherwise.

N.J.S.A. § 56:10–16.

The court finds both parties' formalistic application of this definition to the facts of this case unpersuasive. It is true, as defendants assert, that the Dealer Agreement granted Freedman the right to use GM's tradenames. A franchisee would technically still possess this "franchise," even if deprived of the right to market any of the franchisor's products. However, the court does not conclude from this that no action short of terminating the Dealer Agreement can constitute termination of the franchise; to say this, one would have to allow a franchisor to discriminatorily deny a franchisee the right to purchase any of its products while the franchisor continued to supply them to other distribution outlets in the same market. Such an action by a franchisor would surely defeat the spirit and purpose of the NJFPA; there is no reason to think that the legislature intended to countenance so perverse a result.

On the other hand, the court is unsatisfied with the mechanistic approach of the *Gallo* court. *Gallo* begins with the plausible view that, because the Dealer Agreement does not by its own terms entitle a franchisee to purchase any GM vehicles, the franchise must consist of a combination of the Dealer Agreement and the Motor Vehicle Addenda. 711 F.Supp. at 815. However, *Gallo* further concludes that because the Dealer Agreement states, in the singular, that a dealer has the right to buy those GM trucks "identified in the Motor Vehicle Addendum hereto," the parties intended that each addendum, coupled with the Dealer Agreement, constituted a separate franchise. *Id.* at 815. This reasoning, entails that a single product, if it had its own addendum, would necessarily constitute an independent franchise, and that elimination of an addendum which substantially overlapped another would constitute termination of a franchise. In its moving papers, defendant represents that in circumstances identical to the case at issue, it arbitrarily combines and eliminates addenda, deleting products from one list and adding them to another. Although such representations cannot be considered as assertions of fact, the court is satisfied that, taken as hypotheticals, they further illustrate the implausibility of resting the definition of a "franchise" on any thing so formalistic as the existence of a separate addendum. In the absence of further guidance from the New Jersey state courts, this court is convinced that the pragmatic test adopted by the Second Circuit in *Glick* best answers to the purposes the NJFPA was intended to serve:

Where a dealer has made an investment in parts and training service em-

---

drawal was preempted by the PMPA. But, as described above, it is the view of this court that the NJFPA does not extend to such situations. The issue herein is rather whether a franchisor withdrawing from a market but entering into a new venture in which it intends to trade, in part, on the goodwill accumulated in its prior course of business, can be found liable under New Jersey state law. Therefore, even if the PMPA's substantive provisions and broader preemption provision applied to the AFDA, neither it nor the *Jimenez* holding would preclude the present action.

ployees and where the line of trucks is functionally related to a distinct segment of the market, as heavy-duty trucks appear to be, and where their sale constitutes a substantial part of the dealer's revenues, it may be that the dealer has been given a "franchise."

865 F.2d at 497.[5]

The court concludes that the *Glick* test best responds to the threat of abuse that the NJFPA was intended to counter. The economic threat implicit in a franchisor's superior bargaining power is that it will appropriate the goodwill earned by terminated franchisees without compensation for the dealer's investment in capital and training. Termination of a product will not implicate these concerns if a dealer can preserve his investment by shifting his labor and capital to a similar product and capitalize on consumer goodwill by selling products to the same general market segment. However, where a franchisor terminates all the products that relate to a distinct market segment, the franchisee may lose all the value of her investment in training, parts, and goodwill, since, if the market segments are genuinely distinct, consumer recognition and reputation will not carry over from one market to another. More simply, it may also be the case that termination of some, but not all, of a dealer's products so substantially limits the dealer's ability to do business as to effectively terminate the entire franchise.

■ Hence, it is a factual issue whether, in any given instance, termination of product lines will amount to termination of a franchise. *Glick*, 865 F.2d at 497; *see also C–B Kenworth, Inc. v. General Motors Corp.*, 706 F.Supp. 952 (D.Me.1988) (question of separate franchise a factual issue).

In the present case, there is an inference raised that the light, medium, and heavy duty truck lines represented by the three addenda may constitute separate franchises, since the territories assigned for each type of product differ. However, the parties have yet to clarify other factors relevant to determining the distinctness of the heavy duty market, the nature of plaintiff's investment in it, and the portion of plaintiff's business represented by the heavy duty line. Hence, it will be appropriate to proceed to the fact-finding stage to determine if Freedman held a separate franchise in heavy duty trucks. If the existence of such a franchise is established, then, in light of the continued manufacture of the Brigadier truck, and, if demonstrated, GM's continued market presence, GM's termination of Freedman could be found to be in violation of the NJFPA.

*Contractual Claims*

■ In addition to its claims under the NJFPA, plaintiff raises various contractual claims based on alleged breaches of the Dealer Agreement and Heavy Duty Addendum. First, in the Fourth Count of its complaint, plaintiff alleges that by canceling the Heavy Duty Addendum GM breached the Dealer Agreement.

Plaintiff argues that Section IV of the Dealer Agreement provides the exclusive procedures through which termination of the Agreement may occur, and that defendant's actions in canceling the Heavy Duty Addendum falls within none of the grounds set forth in Section IV. *See* Plaintiff's Mem., Ex., A. Defendant replies that it is explicitly permitted by the terms of the Dealer Agreement to withdraw products from Freedman, as it did by terminating the Heavy Duty Addendum. In particular, defendant relies on ¶ 1.5 of the Dealer Agreement, which reads:

General Motors may discontinue any Product at any time and its only obligation shall be to manufacture and deliv-

---

**5.** *See also In re General Motors and Volvo White Corp.–Heavy Truck Dealers,* No. 8760 0812, Slip Op. at 17 (Dec. 17, 1982) (*cited in Gallo,* 711 F.Supp. at 817) (refusing to put "the form of the dealer agreement over its substance," the Bureau of Professional and Occupational Affairs of the Commonwealth of Pennsylvania found, under state law, that a heavy duty truck sales arrangement was a separate franchise, where the heavy duty truck market was found to be different from the light and medium duty markets, GM treated its heavy duty line distinctly, and GM and Volvo White testified that the heavy duty truck industry is considered to be separate and distinct from the light and medium duty industries).

er to Dealer accepted orders which Dealer does not elect to cancel.

Other provisions of the contract state that "[General Motors] may change the Motor Vehicle Addendum by furnishing Dealer a superseding Motor Vehicle Addendum," ¶ 1.1.1., and that "General Motors will not be liable for any delay or failure to deliver Products where such delay or failure is caused, in whole or in part, by: ... any curtailment of production due to economic conditions, or any discontinuance of manufacture or sale by General Motors." ¶ 1.4.

The court finds unconvincing plaintiff's arguments that the language of ¶ 1.1.1. entails that GM may *only* change the Heavy Duty Addendum by replacing it with an updated version, or that cancellation of the Heavy Duty Addendum constituted a termination of Freedman's contractual rights by a method not sanctioned by Article 4.[6] The plain meaning of ¶¶ 1.1.1, 1.4, and 1.5 provides GM the contractual right to cancel the Heavy Duty Addendum. The court reads Article 4 as setting forth the sole procedures by which the parties may terminate the Dealer Agreement. But cancellation of the Heavy Duty Addendum does not, on its face, constitute such a termination.

In this regard, the terms of the Dealer Agreement differ importantly from the provisions of the NJFPA. The latter specifies the circumstances in which termination of a *franchise* is permissible; Article 4 of the Dealer Agreement provides for termination of the Dealer Agreement itself. Hence, even if heavy duty trucks represent an independent franchise, termination of this "franchise" would not necessarily constitute termination of the Dealer Agreement, and hence would not be subject to the provisions of Article IV.

In reaching this conclusion, the court is unpersuaded by the reasoning of the Second Circuit in *Glick*, which held that cancellation of a Heavy Duty Addendum raised a triable issue of fact concerning whether Article IV of the Dealer Agreement had thereby been breached. 865 F.2d at 498. However, the court agrees with the central assumption of the *Glick* analysis: "Article 1.5 of the Agreement could be a means of circumventing Article 4's termination provisions." *Id.* This court would only depart from *Glick* by holding that, where product discontinuance in effect amounts to termination of the Dealer Agreement, rather than merely termination of a franchise contained within that agreement, then such discontinuance is not permissible under ¶ 1.5 and would breach Article IV. In this case, plaintiffs have not alleged that elimination of the heavy duty truck business would effect so substantial a curtailment of GM's product offerings as to effectively cancel the entire Dealer Agreement. The court therefore will grant defendant's motion to dismiss Freedman's breach of contract claim, but, in light of the unclarity of the relevant legal standard, will also grant plaintiff leave to amend its complaint with respect to this claim.[7] Because plaintiff's entitlement to termination assistance under Article V is predicated on defendant's termination of the Dealer Agreement, defendant's motion to dismiss Count IX seeking termination assistance will also be granted.

Plaintiff has also charged GM with breach of the implied covenant of good faith and fair dealing. Under New Jersey law, there is an implied covenant of good faith and fair dealing in every contract. *Onderdonk v. Presbyterian Homes*, 85 N.J. 171, 182, 425 A.2d 1057 (1981). The implied covenant prohibits a party to the contract from doing anything that "will

---

**6.** Plaintiff's claim that the course of conduct between the parties precludes GM from discontinuing the Heavy Duty Addendum is also unfounded. The Dealer Agreement explicitly sets forth the rights and duties of the parties, and usage and custom cannot be proved to alter or contradict contract terms free of ambiguity. *Chase Manhattan Bank v. May*, 311 F.2d 117, 119 (3d Cir.1962), *cert. denied*, 372 U.S. 930, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963). Further, the

course of conduct alleged by plaintiff fails to establish that GM's cancellation of the Heavy Duty Addendum was in breach of or inconsistent with its contractual obligations.

**7.** In light of this holding, the court need not rule at this time on the question of whether general withdrawal from a market excuses product termination that would otherwise constitute *de facto* termination of the Dealer Agreement.

destroy or injure the right of the other party to receive the fruits of the contract." *Feldman v. U.S. Sprint Communications Co.,* 714 F.Supp. 727, 731 (D.N.J.1989). However, the "function of the court is to enforce the [agreement] as written, not to write for the parties a different or a better contract." *Liqui–Box Corp. v. Estate of Elkman,* 238 N.J.Super. 588, 599–600, 570 A.2d 472 (App.Div.1990), *cert. denied,* 122 N.J. 142, 584 A.2d 214 (1990). In this case, the terms of the contract are clear, and plaintiff has not alleged that defendants have taken any action outside the court's understanding of defendants' contractual rights or tending to deprive plaintiff of the fruits of its agreement. The contract explicitly allows GM to withdraw products; it is no breach of the implied covenant of good faith and fair dealing to do so.[8]

■■■■ Plaintiff also claims that GM has violated the public policy and common law of New Jersey. New Jersey courts have refused to enforce contracts in a number of situations where to do so would violate the public policy of the state, as where contracts violate statutes, promote crime, encourage divorce, or breach public morality. *Vasquez v. Glassboro Service Ass'n, Inc.,* 83 N.J. 86, 98–101, 415 A.2d 1156 (1980). A contract may be set aside where its purpose is contrary to the common good or where it contains unconscionable terms that are the product of the unequal bargaining power of the parties. *See, e.g., Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied,* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974) (franchise contract allowing for termination on ten days notice was set aside as against public policy); *Rudbart v. North Jersey District Water Supply Commission,* 238 N.J.Super. 41, 568 A.2d 1213 (App.Div. 1990), *cert. granted,* 122 N.J. 136, 584 A.2d 210 (1990).

In the present case, however, the legislature has already addressed precisely the public policy concern cited by plaintiffs. The NJFPA was intended, in part, to reme-dy inequalities in bargaining power and the potential for opportunistic exploitation of the franchise relationship by the franchisor. In this circumstance, the court finds neither mandate nor warrant for adding to the formidable protections the legislature has already afforded franchisees. Accordingly, the court will grant defendant's motion to dismiss plaintiff's claim based on alleged violations of New Jersey common law and public policy.

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss is granted with respect to plaintiff's claim for breach of express contract (Count IV), breach of contract based on course of conduct (Count V); breach of implied covenants of good faith and fair dealing (Count VI); violation of the common law and public policy of New Jersey (Count III); partial termination of plaintiff's franchise (Count II); and failure to comply with the requirements for termination assistance under the Dealer Agreement. (Count IX). Defendants' motion to dismiss is denied with respect to plaintiff's claim that GM has violated the New Jersey Franchise Practices Act (Count I). Plaintiff is further granted leave to amend its complaint with respect to its claims for breach of contract (Count IV).

---

**8.** The case might be different if plaintiff alleged that the cancellation of the Heavy Duty Franchise amounted to a *de facto* termination of the Dealer Agreement. But, as noted above, plaintiff has failed to raise such an allegation.