**WLR FOODS, INCORPORATED,**
Plaintiff–Appellee,

v.

**TYSON FOODS, INCORPORATED;**
**WLR Acquisition Corporation,**
Defendants–Appellants,

William H. Groseclose; Herman D. Mason; George E. Bryan; Calvin G. Germroth; Charles W. Wampler, Jr.; James L. Keeler; Charles L. Campbell; Stephen W. Custer; J. Craig Hott; William D. Wampler, Defendants–Appellees,

Albemarle Corporation; Bassett Furniture Industries, Incorporated; Cadmus Communications Corporation; Central Fidelity Banks, Incorporated; CFW Communications Company; Chesapeake Corporation; Crestar Financial Corporation; CSX Corporation; Dana Corporation; Dibrell Brothers, Incorporated; Ethyl Corporation; Executone Information Systems, Incorporated; First Colony Corporation; Garan, Incorporated; James River Corporation; Lawyers Title Corporation; Media General, Inc.; Olin Corporation; Owens & Minor, Inc.; Philip Morris Companies, Incorporated; Piedmont Bankgroup, Incorporated; The Pittston Company; TFC Enterprises, Incorporated; Tredegar Industries, Incorporated; Union Camp Corporation; United Dominion Realty Trust, Incorporated; Universal Corporation; Commonwealth of Virginia, Amici Curiae.

No. 95–1039.

United States Court of Appeals,
Fourth Circuit.

Argued July 13, 1995.

Decided Sept. 22, 1995.

**ARGUED:** Richard Chase Tufaro, Milbank, Tweed, Hadley & McCloy, Washington, DC, for appellants. Douglas Leigh Guynn, Wharton, Aldhizer & Weaver, P.L.C., Harrisonburg, VA, for appellees. **ON BRIEF:** Thomas F. Farrell, II, Thomas E. Spahn, McGuire, Woods, Battle & Boothe, L.L.P., Richmond, VA, for appellants. Thomas E. Ulrich, Wharton, Aldhizer & Weaver, P.L.C., Harrisonburg, VA, for appellee WLR Foods; John W. Zunka, Richard H. Milnor, Taylor, Zunka, Milnor & Carter, Ltd., Charlottesville, VA, for appellees Bryan, et al. F. Claiborne Johnston, Jr., James S. Crockett, Jr., Mays & Valentine, Richmond, VA, for amici curiae Albemarle Corp., et al. James S. Gilmore, III, Attorney General of Virginia, Catherine C. Hammond, Deputy Attorney General, Richard B. Zorn, Senior Assistant Attorney General, John B. Sternlicht, Assistant Attorney General, Office of the Attorney General, Richmond, VA, for amicus curiae Commonwealth of Virginia.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Chief Judge ERVIN and Senior Judge PHILLIPS joined.

## OPINION

MURNAGHAN, Circuit Judge:

The instant case arose from an attempt by Tyson Foods, Inc. ("Tyson"), a nationwide poultry producer, to acquire WLR Foods, Inc. ("WLR"), a chicken and turkey producer. In early 1994, Tyson engaged in extensive discussions with certain members of WLR's Board of Directors ("the WLR Board") in an attempt to arrange a merger between Tyson and WLR. The WLR Board, resistant to the idea of being acquired by Tyson, adopted various defensive measures to protect WLR against the takeover. Tyson eventually presented a tender offer directly to the stockholders of WLR, but withdrew the offer several months later, claiming that, due to actions taken by the WLR Board,

Tyson's offering price was no longer reflective of the value of WLR's stock. Tyson now challenges several rulings of the district court, which found that the defensive tactics adopted by the WLR Board were a valid legal means by which to respond to the threatened takeover of WLR by Tyson.

## I. *Factual Background*

Tyson is a large poultry producer incorporated in Delaware, with its principal office in Arkansas. Tyson conducts operations in many states, including Virginia. WLR is a Virginia corporation with a substantial turkey operation as well as a chicken business. The stocks of both companies are publicly held and traded.

In late 1993 and again on January 3, 1994, Don Tyson, Chairman of Tyson, contacted James Keeler, President and Chief Executive Officer of WLR, with a proposal to merge WLR with Tyson. Don Tyson's proposal included an offer to buy WLR stock from the shareholders at thirty dollars per share. Keeler informed Don Tyson that WLR was not for sale, but nevertheless met with Mr. Tyson on January 12, 1994 to discuss the proposal.

An informal WLR Board meeting was held on January 20, 1994 regarding the Tyson offer. No minutes were recorded at the meeting, and no votes were taken. The consensus of the Board at the meeting was that it preferred for WLR to remain independent and would reject Tyson's offer. On January 24, 1994, Keeler informed Don Tyson that he had spoken with the Board, and that WLR wished to remain independent. On that same day, Don Tyson delivered a letter to WLR's Board describing the acquisition proposal. In response, on January 25, 1994, Keeler issued a letter to WLR shareholders asserting that WLR was "not for sale," but stating:

> As it must, WLR Foods Board will meet in the near future to evaluate Tyson's offer.

Be assured that your Board will listen carefully to its advisors and management and make a decision it believes is in the best interest of, and appropriately protects, our shareholders, employees and producers. In this regard, the Board's historical commitment to the continued independence of WLR Foods will be keenly important.

WLR next sought advisors to provide guidance concerning the proposed merger. Keeler travelled to Washington, D.C. and with the help of WLR management and counsel, interviewed potential financial advisors. At a WLR Board meeting on January 25, 1994, the Board approved the suggestion of the management team to hire Goldman, Sachs & Co. and Wheat, First, Butcher & Singer for financial advice, as well as to retain the services of two law firms, Sullivan & Cromwell and Wharton, Aldhizer & Weaver. On January 28, 1994, the WLR Board met with its management, advisors, and counsel to discuss the implications of the merger proposal and to receive information from the advisors. The minutes of the meeting reflect that no decision was reached that day regarding the merger.

On February 4, 1994, the WLR Board reconvened to discuss the merger with its advisors. After representatives of Goldman, Sachs & Co. concluded that Tyson's offer of thirty dollars per share was inadequate, the Board considered the recommendation and voted to reject the Tyson merger proposal. The Board also adopted certain measures to defend against a possible takeover attempt. The Board amended WLR's bylaws to provide that the chairman and vice-chairman of the WLR Board were not officers of the corporation. It further amended the bylaws to establish that the record date for purposes of any vote under the Virginia Control Share Acquisitions Act would be the date on which an acquiring person requested a special shareholder's meeting for such a vote.[1] In

---

1. The Virginia Control Share Acquisitions Act, Va.Code Ann. §§ 13.1–728.1 to –728.9, provides that if a bidder, such as Tyson, obtains a certain percentage of the shares in a target corporation, it will not be permitted to vote those shares unless a majority of the corporation's other shareholders vote at a control share referendum to grant the bidder voting rights. The record date is the date on which it is determined which holders of stock will be entitled to vote in the control share referendum.

addition, four WLR directors, Charles Wampler, William Wampler, Herman Mason, and George Bryan, resigned from their positions as WLR employees, and the Board approved a package of lifetime health benefits for each of them. Finally, the WLR Board adopted a shareholder rights plan, or "poison pill," in order to provide that the acquisition by Tyson of fifteen percent or more of WLR's stock would trigger an option for all shareholders except Tyson, the acquiring shareholder, to purchase WLR stock at a favorable price, thereby diluting the value and voting rights of Tyson's stock. WLR notified Don Tyson by a letter dated February 6, 1994 that the Board had unanimously decided not to pursue merger negotiations with Tyson.

WLR initiated the instant action in the United States District Court for the Western District of Virginia on February 6, 1994, seeking declaratory relief regarding the constitutionality of certain Virginia statutes as well as the validity of the shareholder rights plan adopted at the February 4, 1994 WLR Board meeting. Tyson answered WLR's complaint on February 25, 1994 and asserted counterclaims against WLR. Tyson sought a declaration that the Virginia statutes which allow companies to adopt defensive measures against takeover attempts were unconstitutional, as well as an injunction against defensive actions taken by the WLR Board under those statutes.

On March 9, 1994, Tyson presented its thirty dollars per share cash tender offer directly to WLR's stockholders. The offer was launched through Tyson's wholly-owned subsidiary, WLR Acquisition Corp., a company that was created to effectuate the merger with WLR. On April 14, 1994, Tyson submitted a control share statement to WLR. April 14 thus became the Control Share Acquisitions Act record date under WLR's amended bylaws, and a special shareholders meeting and control share referendum were set for May 21, 1994. At the shareholders meeting, the WLR directors urged the shareholders to vote against the referendum, which would

have permitted Tyson to vote its shares in favor of a takeover. Tyson was not able to secure a majority of the shares eligible to vote, and the referendum was, therefore, defeated.

On July 27, 1994, WLR entered into an agreement with Cuddy Farms, Inc. and Cuddy International Corp. (collectively, "Cuddy") to acquire Cuddy's assets in exchange for cash and a percentage of WLR's common stock. As part of the transaction, WLR and Cuddy came to an agreement which provided that Cuddy would vote the approximately ten percent of WLR's stock that it had acquired in the transaction in accordance with the directions of the WLR Board for a four-year period. The Cuddy transaction further diluted the voting power of Tyson's WLR stock. Tyson terminated its tender offer on August 4, 1994, feeling that its offer of thirty dollars per share was no longer an accurate reflection of the worth of WLR's stock.

On December 6, 1994, the district court in the instant case entered a final order denying relief to Tyson on its claims. On appeal, Tyson both renews the claims raised in the district court against WLR, and challenges a district court ruling denying Tyson access during discovery to the substantive financial and legal advice given to the WLR Board regarding the merger. Tyson contends that it remains prepared to renew its tender offer if the district court's orders are modified or reversed. For the reasons stated below, however, we affirm.

## II. Constitutionality of the Virginia Statutes

■ We address first Tyson's challenge to the constitutionality of four Virginia statutes: the Control Share Acquisitions Act ("Control Share Act"), Va.Code Ann. §§ 13.1–728.1 to –728.9; the Affiliated Transactions Act, Va. Code Ann. §§ 13.1–725 to –727.1; the "Poison Pill Statute," Va.Code Ann. § 13.1–646; and the "Business Judgment Statute," Va. Code Ann. § 13.1–690. Tyson claims that the four statutes, considered in concert, impermissibly restrict the ability of a bidder to effect a takeover of a Virginia corporation. According to Tyson, the statutes thereby

controvert the purposes of the Williams Act, 15 U.S.C. §§ 78m(d)-(e) and 78n(d)-(f), and are preempted by virtue of the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2. Further, Tyson claims that because they render hostile takeovers impossible in practice, the Virginia statutes violate the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3. The district court held that the statutory scheme was not preempted by the Williams Act and did not violate the Commerce Clause. The district court's analysis of the statutes in the instant case presents questions of law which we review *de novo*. *See Johnson v. Hugo's Skateway,* 949 F.2d 1338, 1349 (4th Cir.1991).[2]

The first statute at issue, the Control Share Act, Va.Code Ann. §§ 13.1–728.1 to – 728.9, provides that when an acquiror holds a certain percentage of the voting shares of a company, those shares do not carry any voting rights unless the shares are granted such rights, in a shareholder referendum, by a majority of all disinterested shares entitled to vote. *Id.* § 13.1–728.3. Disinterested shares consist of all shares with voting power, excluding those that are owned by the acquiring person, an officer of the target corporation, or an employee of the target corporation who is also a director. *Id.* § 13.1–728.1. The target corporation may set a record date on which it is determined which shares are interested and which are entitled to vote in the control share referendum. *See id.* § 13.1–660.

The second statute in question is the Affiliated Transactions Act, Va.Code Ann. §§ 13.1–725 to –727.1, which prohibits certain transactions (such as mergers, share exchanges, sales of assets, and dissolution) between a corporation and an interested shareholder for a period of three years following the date on which the interested shareholder becomes an interested shareholder, unless the transaction is approved by a majority of the disinterested directors and by two-thirds of the voting shares other than those beneficially held by the interested shareholder. *Id.* §§ 13.1–725.1, 13.1–726. The statute contains further restrictions on affiliated transactions occurring after the three-year point. *See id.* § 13.1–725.1.

The third statute at issue, the Poison Pill Statute, Va.Code Ann. § 13.1–646, allows a corporation to give shareholders certain rights or options to purchase, on favorable terms, shares in the corporation. The rights take effect upon the occurrence of a specified event, such as the acquisition by one shareholder of a certain percentage of the company's stock. Such rights may be issued discriminatorily, *i.e.,* may be withheld from designated shareholders or groups of shareholders. The directors of the corporation are required to exercise their good faith business judgment when granting such rights.

Finally, the fourth statute, the Business Judgment Statute, Va.Code Ann. § 13.1–690, establishes a standard of care for directors in fulfilling their duties to the corporation. The statute provides that "[a] director shall discharge his duties as a director … in accordance with his good faith business judgment of the best interests of the corporation." *Id.* § 13.1–690(A). The director is entitled to rely on information presented to him or her by specified individuals when the director believes in good faith that the information is competent and reliable, and as long as the director does not have knowledge of information that would make reliance unwarranted. *Id.* § 13.1–690(B).

---

**2.** As a preliminary matter, Tyson claims, based on *West Lynn Creamery, Inc. v. Healy,* —— U.S. ——, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994), that it is appropriate for us to consider the constitutionality of the relevant Commonwealth statutes as a group rather than examining the constitutionality of each statute standing alone. *Healy* does not directly support Tyson's contention, as that case addressed the constitutionality of a single pricing order, *i.e.,* a single integrated scheme consisting of two parts, and not four distinct statutes enacted at different times and having multiple applications. However, we, like the district court, will assume for purposes of this discussion that we may consider the four unintegrated statutes as an integrated unit and judge them as a scheme in assessing their constitutionality.

We note that, on appeal, Tyson has not challenged any of the four statutes individually.

## A. Williams Act Preemption

■ There is a strong presumption against federal preemption of state law. *See Jimenez v. BP Oil, Inc.*, 853 F.2d 268, 271 (4th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989) (quoting *Tousley v. North Am. Van Lines, Inc.*, 752 F.2d 96, 101 (4th Cir.1985)). A state law is preempted by a federal statute only if (1) Congress clearly expresses an intention to do so, (2) it is impossible to comply with both the federal and the state laws, or (3) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 78–79, 107 S.Ct. 1637, 1644, 95 L.Ed.2d 67 (1987) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Because Congress did not clearly express its intent to preempt state law in the Williams Act, *see Edgar v. MITE Corp.*, 457 U.S. 624, 631, 102 S.Ct. 2629, 2634, 73 L.Ed.2d 269 (1982) (plurality op.), and Tyson does not attempt to argue that it would be impossible to comply with both the Williams Act and any or all of the Virginia statutes, we will find the statutes at issue to be preempted only if the Virginia laws serve as an obstacle to the objectives of Congress embodied in the Williams Act.

■ The Williams Act, 15 U.S.C. §§ 78m(d)-(e) and 78n(d)-(f), was passed in 1968 as an amendment to the Securities Exchange Act of 1934, in response to an increase in the frequency of hostile tender offers. *CTS*, 481 U.S. at 79, 107 S.Ct. at 1644. The Act requires an entity which has acquired more than five percent of a class of securities to disclose certain information, including its plans for the target company, within ten days of the acquisition. 15 U.S.C. § 78m(d)(1); *see also CTS*, 481 U.S. at 79–80, 107 S.Ct. at 1644–45. In addition, the Williams Act establishes a set of procedural rules intended to regulate the process of tender offers. The Williams Act is meant to protect investors by placing them "on an equal footing with the takeover bidder." *CTS*, 481 U.S. at 82, 107 S.Ct. at 1645–46

(quoting *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 30, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977)); *see also IU Int'l Corp. v. NX Acquisition Corp.*, 840 F.2d 220, 222 (4th Cir.1988), *adopted en banc*, 840 F.2d 229 (4th Cir.1988) (per curiam). While the Williams Act governs the process of tender offers, it leaves to the states the power to regulate substantive matters of corporate governance. *See CTS*, 481 U.S. at 85–86, 107 S.Ct. at 1647–48.

Tyson contends that the Williams Act has as an additional purpose the maintenance of a level playing field between a bidder and its target in the tender offer situation. Tyson argues that by providing target management with an advantage in takeovers, the Virginia statutes controvert the purpose of the Williams Act and are thus preempted. *See Edgar*, 457 U.S. at 633–34, 102 S.Ct. at 2636 (plurality op.) (finding that an Illinois statute was preempted by the Williams Act, largely because the state statute favored management over bidders to the shareholders' detriment).

However, while we have pointed out that "the Williams Act is designed to maintain neutrality between bidder and target," *IU Int'l*, 840 F.2d at 222, Tyson's argument focusses on an ancillary purpose of the federal statute. Neutrality between bidders and target management is but an incidental result of the broader purpose of the Williams Act to protect investors. *See, e.g., Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 849–50 (1st Cir.1988) ("[N]eutrality between management and bidder is the means to the end of investor protection, rather than the objective itself.... [P]rotection of management that is incidental to protection of investors does not *per se* conflict with the purpose or purposes of the Williams Act." (discussing *CTS*, 481 U.S. 69, 107 S.Ct. at 1639)). The Supreme Court has stated that the Williams Act's "policy of evenhandedness does not go ... to the purpose of the legislation.... Neutrality is, rather, but one characteristic of legislation directed toward a different purpose—the protection of investors," *Piper*, 430 U.S. at 29, 97 S.Ct. at 943; "[T]he sole

purpose of the Williams Act was the protection of investors who are confronted with a tender offer," *id.* at 35, 97 S.Ct. at 946.

In addition, although Congress "expressly disclaimed an intention [in the Williams Act] to provide a weapon for management to discourage takeover bids . . . . ," *IU Int'l,* 840 F.2d at 222 (quoting *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975)), Congress did not forbid the result that Virginia has achieved with the statutory scheme in the instant case. The fact that Congress, when it enacted the Williams Act, did not intend to create an advantage for target management in the takeover situation, does not necessarily mean that Congress meant to prevent the states from allowing management an advantage which is not unfair to investors. As the Seventh Circuit stated in *Amanda Acquisition Corp. v. Universal Foods Corp.,* 877 F.2d 496 (7th Cir.), *cert. denied,* 493 U.S. 955, 110 S.Ct. 367, 107 L.Ed.2d 353 (1989),

> There is a big difference between what Congress *enacts* and what it *supposes* will ensue. Expectations about the consequences of a law are not themselves law. To say that Congress wanted to be neutral between bidder and target—a conclusion reached in many of the Court's opinions— is not to say that it also forbade the states to favor one of these sides. . . . Nothing in the Williams Act says that the federal compromise among bidders, targets' managers, and investors is the only permissible one.

*Id.* at 503 (citation omitted).

■ The means by which the Williams Act achieves its purpose of protecting investors is by requiring disclosure of information in order to allow shareholders to make an informed decision and to prevent coercion in the tender offer context; Tyson has not shown that the Virginia statutes controvert the purpose of the Williams Act by removing protection from investors, for example by keeping information from the shareholders. In fact, Tyson has not shown that the shareholders in this case were deprived of any relevant information. The goal of neutrality between bidder and target, emphasized by

Tyson, is not in itself so central to the purpose of the Williams Act that the Act should be held to preempt a group of state statutes that regulate the balance between a target and a bidder, but do not disadvantage the shareholders or prevent them from gaining access to pertinent information.

■ Tyson further asserts that the Williams Act preempts the Virginia statutes because the Virginia statutory scheme does not provide a bidder with a "meaningful opportunity for success" in effecting a hostile takeover. The "meaningful opportunity for success test" has been used by several district courts to assess whether state statutes are preempted by the Williams Act. *See, e.g., BNS, Inc. v. Koppers Co., Inc.,* 683 F.Supp. 458, 469 (D.Del.1988) ("[E]ven statutes with substantial deterrent effects on tender offers do not circumvent Williams Act goals, so long as hostile offers which are beneficial to target shareholders have a meaningful opportunity for success."); *West Point-Pepperell, Inc. v. Farley, Inc.,* 711 F.Supp. 1096, 1102 (N.D.Ga.1989); *RP Acquisition Corp. v. Staley Continental, Inc.,* 686 F.Supp. 476, 482 (D.Del.1988). Tyson argues that if the Virginia statutes do not allow for a meaningful opportunity of Tyson's success, they frustrate the purposes of the Williams Act.

■ We, like the district court, reject the meaningful opportunity for success test. As we stated above, the purpose of the Williams Act is to protect independent investors from bidders and management by ensuring that the investors have access to information. The statute does not, however, have as an independent purpose the creation of an environment for bidders that is conducive to takeovers. Tyson attempts to use the "meaningful opportunity for success" test to shift the focus of the Williams Act from protection of investors to protection of bidders. However, the Williams Act is simply not designed to protect a company in Tyson's position; "the Williams Act does not create a right to profit from the business of making tender offers." *Amanda,* 877 F.2d at 504–05.

The four Virginia statutes may work to give target management an advantage in the

tender offer context. The preemption question we address here, however, is whether Virginia's decision to allow management access to a set of defensive mechanisms in the takeover situation frustrates the Williams Act's goal of investor protection. We hold that it does not.

### B. *Commerce Clause*

■ We now turn to Tyson's Commerce Clause argument. Tyson claims that the Virginia statutory scheme violates the Commerce Clause both because (1) it discriminates against interstate commerce and is not justified by a valid state purpose other than economic protectionism, and (2) it imposes a burden on interstate commerce that is excessive in relation to the local benefits served by the regulation.

In *CTS*, the Supreme Court held that an Indiana statute very similar to the Control Share Act in the instant case did not discriminate against interstate commerce, because "[i]t has the same effects on tender offers whether or not the offeror is a domiciliary or resident of Indiana. Thus, it 'visits its effects equally upon both interstate and local business.'" *CTS*, 481 U.S. at 87, 107 S.Ct. at 1649 (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)). Since both residents and nonresidents had access to the commodities defined by Indiana state law, there was no discrimination, *CTS*, 481 U.S. at 87, 107 S.Ct. at 1648, even though many tender offers might be launched by out-of-state businesses, and the burden of the state law might fall on those companies, *id.* at 88, 107 S.Ct. at 1649. In addition, the Supreme Court pointed out that the fact that the Indiana Act might limit the number of successful tender offers did not change the Commerce Clause analysis in any substantial way. *Id.* at 93, 107 S.Ct. at 1651.

Similarly, in *Amanda*, the Seventh Circuit held that an affiliated transactions statute even more restrictive than the one in the instant case did not violate the Commerce Clause, because it did not regulate or forbid interstate transactions and did not make distinctions based on the domicile of the bidder.

877 F.2d at 506. The court stated that although the Wisconsin law might make a buyer less willing to buy, or might lower the bid, other corporate laws also had that effect, and such a result did not necessarily lead to a Commerce Clause violation. *Id.*

■ The group of statutes at issue here regulates only Virginia corporations, and treats in-state and out-of-state tender offerors exactly the same. Anyone can attempt the takeover of a Virginia corporation, and a Virginia bidder confronts the same difficulties as an out-of-state bidder. There is simply no evidence of discrimination among bidders. Tyson nevertheless contends that, even if the statutes are not facially discriminatory, they discriminate against interstate commerce by making it extremely difficult to gain control of a Virginia corporation and thereby "hoarding" a local resource. *See, e.g., C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, — U.S. —, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (discrimination against interstate commerce found where a flow control ordinance required all nonhazardous solid waste within a town to be processed at a local processing facility, thus hoarding waste for that facility). However, in the instant case, no commodity is being hoarded by Virginia. Although they increase the difficulty or expense of gaining control of a Virginia corporation, the statutes in the instant case do not erect a complete ban on the control of such corporations. Tyson has simply not established that the statute at issue discriminate against interstate commerce.

■ Second, Tyson claims that the Virginia scheme is unconstitutional under the Commerce Clause, because the statutes impose a burden on interstate commerce which exceeds their putative local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). There has been some controversy since the Supreme Court's decision in *CTS* as to whether the balancing test described in *Pike* is to be used in a situation such as the instant one. *See Amanda*, 877 F.2d at 505; *see also CTS*, 481 U.S. at 95–96, 107 S.Ct. at 1652–53 (Scalia, J., concurring). However, even as-

suming that the Virginia statutes impose some incidental burden on interstate commerce, we find the burden to be outweighed by the interest of Virginia in regulating its corporations. As the district court pointed out, Virginia is permitted to determine that hostile takeovers can be detrimental to Virginia corporations, and it may regulate takeovers accordingly. In addition, it is significant for the Commerce Clause analysis that Virginia's "regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." *CTS*, 481 U.S. at 89, 107 S.Ct. at 1649. Although the laws that states enact to regulate their corporations necessarily affect interstate commerce,

> [i]t ... is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.

*Id.* at 91, 107 S.Ct. at 1650–51. We do not find that the burden imposed on interstate commerce by Virginia's statutes is "clearly excessive," *see Pike*, 397 U.S. at 142, 90 S.Ct. at 847, to the potential local benefits of the statutory scheme.

Virginia has provided both residents and nonresidents with equal access to takeovers. The Commonwealth has a clear interest in regulating the relationships that affect the corporations that are located within its territory and are a product of its own laws. We conclude that the Virginia statutes at issue do not violate the Commerce Clause, because they do not discriminate against interstate commerce, and to the extent that they burden interstate commerce, the burden is justified by the legitimate interest of the Commonwealth in regulating its corporations.

## III. *The Business Judgment Statute*

In its next assignment of error, Tyson challenges the district court's finding that the Virginia Business Judgment Statute, Va.

Code Ann. § 13.1–690 (" § 690"), allows an inquiry only into the processes employed by corporate directors in making their decisions regarding a takeover, and not into the substance of those decisions. Pursuant to that interpretation, the district court denied Tyson access during discovery to the substantive content of the materials used by the WLR Board in responding to Tyson's takeover attempt.

### A. *Applicability of § 690*

Tyson first challenges the district court's finding that § 690 applies to Tyson's claims against the directors on the WLR Board. Tyson argues that in certain situations, the statutory standard for judging director activity in Virginia embodied in § 690 should be abandoned in favor of the Virginia common law standard of duty of loyalty. Tyson claims that two such situations existed in the instant case: (1) a conflict of interest was present on the target board of directors, and (2) the directors were sued for an injunction rather than for damages. The district judge rejected Tyson's arguments, finding that § 690 provides the exclusive standard by which director actions are measured in Virginia in a case such as the instant one. We agree.

The Virginia Code contains a statutory standard of care for directors, which applies to all aspects of a Board's actions in responding to a tender offer. For example, the Code expressly provides that actions of directors with respect to issuing rights or options for the purchase of shares of a corporation are subject to review under the standard articulated in § 690. *See* Va.Code Ann. § 13.1–646(B). Similarly, the Code provides that conduct concerning affiliated transactions, *see id.* § 13.1–727.1, as well as transactions involved in control share acquisitions, *see id.* § 13.1–728.9, are subject to § 690. In other words, actions taken by directors in responding to tender offers are explicitly made subject to § 690 standards by the Virginia Code, thereby foreclosing reliance on common law. *See Higgins v. Bowdoin*, 238 Va. 134, 140, 380 S.E.2d 904, 908 (1989) (holding that a statute that applied to a certain set

of circumstances supplanted the contrary common law in that situation).

■ Further, Tyson has not provided us with any convincing reasons for which § 690 should not apply in the instant case. Tyson's first argument, that a conflict of interest was present on the WLR Board which should preclude the application of § 690 to Tyson's claims and allow recourse to the common law, is without merit. Virginia law contains a statutory provision which addresses director conflicts of interest arising from hostile takeover situations. *See* Va.Code Ann. § 13.1–691; *see also Izadpanah v. Boeing Joint Venture,* 243 Va. 81, 83, 412 S.E.2d 708, 709 (1992). The Virginia Code provides:

A. A conflict of interests transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect personal interest. . . .

. . . .

B. For the purposes of this section, a director of the corporation has an indirect personal interest in a transaction if:

1. Another entity in which he has a material financial interest or in which he is a general partner is a party to the transaction; or

2. Another entity of which he is a director, officer or trustee is a party to the transaction and the transaction is or should be considered by the board of directors of the corporation.

Va.Code Ann. § 13.1–691. Tyson has failed to show that any WLR Board member had a conflict of interest as defined in § 13.1–691, and even if Tyson could prove such a conflict, Tyson's claim would be governed by the statutory standard in § 13.1–691, not by Virginia common law. Tyson's attempt to escape from the statutory standard of care for directors is simply unavailing in the face of the statutory scheme in Virginia.

■ We also reject Tyson's second argument, that § 690 does not apply when directors are sued for injunctions. Section 690 states that "[a] director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section." Va.Code Ann. § 13.1–690(C). Tyson claims that the purpose of § 690 is to protect directors only from personal liability, and argues that it would be more appropriate to resort to common law standards to assess director behavior in injunctive actions. However, § 690 by its terms establishes "standards of conduct" for the director of a corporation in "discharg[ing] his duties as a director;" the provision does not merely shield from liability a director who has complied with the standard, once he is sued. It is clear from the language of the statute that the articulated standard is meant not only to provide a way in which to assess a director's personal liability, but also to establish a benchmark against which a director's actions shall be measured in other contexts. *See* Daniel T. Murphy, *The New Virginia Stock Corporation Act: A Primer,* 20 U. Rich. L.Rev. 67, 107 (1985). In addition, the references to § 690 in the provisions of the Virginia Code dealing with various aspects of tender offers are pervasive. In the face of the clear language of the statute dictating the broad application of § 690, Tyson has pointed to no Virginia law to support its contention that § 690 does not apply to injunctive actions against corporate directors. We therefore find that § 690 applies to director behavior in actions such as the instant one.

Virginia has provided for a statutory standard to govern the duty of directors in tender offer situations. Tyson has failed to convince us that there is any reason not to use that standard in the instant case. We find that the district court was correct in deciding that, in the Commonwealth of Virginia, the actions of directors in tender offer situations such as the instant one must be examined under § 690.

B. *Discovery Rulings*

■ We next turn to Tyson's challenge to the district court's limitation of discovery under Federal Rule of Civil Procedure 26. The district court denied Tyson access to the information and recommendations that were given to the WLR Board by its advisors, pursuant to the court's finding

that, under the applicable Virginia law, the information sought to be discovered by Tyson was not "reasonably calculated to lead to the discovery of admissible evidence" and was therefore not discoverable under Federal Rule of Civil Procedure 26(b)(1). To the extent that the district court's decision rests on issues of statutory interpretation, we review the court's decision *de novo, see C.G. Willis, Inc. v. The Spica,* 6 F.3d 193, 196 (4th Cir.1993) (citing *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991)); however, we review only for abuse of discretion the district court's rulings regarding the scope of discovery, *see Ardrey v. United Parcel Service,* 798 F.2d 679, 682 (4th Cir.1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987).

Federal Rule of Civil Procedure 26 provides, in relevant part:

> (b) *Discovery Scope and Limits.* Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

>> (1) *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26. Thus, under Rule 26, even information that is not admissible at trial is discoverable, as long as it is "relevant to the subject matter involved in the pending action." *Id.* (b)(1). The parties in the instant case agree that relevance under Rule 26 must be determined by reference to the substantive law which forms the basis of their claims and defenses.

The district court made its discovery rulings pursuant to its interpretation of the Virginia Business Judgment Statute, Va. Code Ann. § 13.1–690. Section 690 provides as follows:

> *§ 13.1–690. General standards of conduct for director.*—A. A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his *good faith business judgment* of the best interests of the corporation.

> B. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

>> 1. One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;

>> 2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or

>> 3. A committee of the board of directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.

(emphasis added). The district court held that under the standard articulated in § 690, only the good faith business judgment of the directors was at issue in Tyson's claims, and the rationality *vel non* of the decision ultimately reached by the WLR Board was not relevant. The district court thus permitted Tyson to inquire into the procedures followed by the WLR directors during their investigation of Tyson's offer that indicated whether or not they were considering the offer in good faith, but did not allow Tyson access to the actual substantive information that was used by the directors in making their decision regarding the offer.

We find that the district court did not abuse its discretion in limiting discovery in the instant case. First, it is clear from the

language of § 690 that the actions of a director are to be judged by his or her good faith in performing corporate duties, and not by the substantive merit of the director's decisions themselves. Tyson concedes that good faith is the relevant standard under § 690. However, according to Tyson, although § 690 itself does not focus on whether a director's decision is substantively correct, knowledge of the substantive content of the information that was available to the director is necessary in order to determine whether the decision was made in good faith. Tyson claims that a litigant cannot prove a director's lack of good faith without having access to all of the information on which the director relied.

In essence, Tyson hopes to prove lack of good faith in the instant case by showing that, based upon the substantive information received by the WLR Board, the Board should have reached a different result. However, that argument imports an aspect into the Virginia standard of director conduct that is not part of Virginia law. It reduces, and nearly eliminates, the ability to rely, in good faith, on experts. Whether a different person would have come to a different conclusion given the information that a director had before him is simply irrelevant to the determination of whether a director in Virginia has acted in good faith in fulfilling his corporate duties.

In fact, it is precisely such a comparison between a director and the hypothetical reasonable person that the Virginia legislature explicitly chose to reject when it enacted § 690. The Model Business Corporation Act ("the Model Act"), which embodies the traditional formulation of the business judgment rule, provides that:

(a) A director shall discharge his duties as a director, including his duties as a member of a committee:

(1) in good faith;

(2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) in a manner he reasonably believes to be in the best interests of the corporation.

Model Act § 8.30. The business judgment rule contained in the Model Act, like § 690, is based upon a director's good faith. By referring to an "ordinarily prudent person" and the director's "reasonabl[e] belie[f]" concerning the corporation's best interests, however, the Model Act makes clear that one of the ways in which a litigant may prove that a director did not exercise good faith is by showing that a director's decision is irrational, *i.e.*, that the decision does not comport with what a reasonable person would do under similar circumstances.

Section 690, however, contains no reference to the "reasonable person." In fact, the Virginia legislature expressly chose to reject the Model Act standard:

[Section 690], especially subsection A, is significantly different from the Model Act's treatment of the same subject in § 8.30. . . .

. . . .

The term "reasonable" is intentionally not used in the standard. It thereby eliminates comparison of the conduct in question with the idealized standard and removes the question of how great a deviation from this idealized standard is acceptable.

Virginia Corporation Law with Commentaries and Rules 197–98 (1992 ed.) (Joint Bar Committee Commentary); *see also* Murphy, 20 U. Rich. L.Rev. at 108 (Under § 690, "[t]he trier of fact need only find good faith and determine whether the conduct in question was a product of the director's own business judgment of what is in the best interest of the corporation. The director's conduct or decision is not to be analyzed in the context of whether a reasonable man would have acted similarly."); *id.* ("The statute . . . may . . . protect the utterly inept, but well-meaning, good faith director."). Directors' actions in Virginia are not to be judged for their reasonableness, and we, like the district court, reject Tyson's attempt to inject such a standard into Virginia law. We thus hold that the district court did not abuse its discretion in denying Tyson permission to discover the substantive content of the rec-

ommendations made to the WLR Board, because pursuant to the governing Virginia law, that information was not relevant under Federal Rule of Civil Procedure 26(b)(1).[3]

In addition, we do not believe that the district court's ruling restricting discovery prevented Tyson from being able to determine whether the actions of the Board in the instant case were in good faith. As the district judge stated,

> [t]he means of addressing good faith for Tyson must be in keeping with the procedural thrust of the statute. Neither the statute nor the Magistrate Judge's order would necessarily preclude, for instance, inquiry into the identity and qualifications of any sources of information or advice sought which bear on the decision reached, the circumstances surrounding selection of these sources, the general topics (but not the substance) of the information sought or imparted, whether advice was actually given, whether it was followed, and if not, what sources of information and advice *were* consulted to reach the decision in issue. In short, the statute permits inquiry into the procedural indicia of whether the directors resorted in good faith to an informed decisionmaking process.

*WLR Foods, Inc. v. Tyson Foods, Inc.,* 857 F.Supp. 492, 494 (W.D.Va.1994). Tyson was given access to various records bearing on the way in which the WLR Board made decisions. The redacted copies of Board meetings, while they do not reveal the substantive advice given to the Board, make clear the subjects that were discussed at the Board meetings. Tyson knew when advisors were hired, and who those advisors were. Tyson discovered which issues the WLR Board considered in determining whether to reject Tyson's offer. In sum, under the district court's interpretation of § 690, Tyson was given an opportunity to determine whether the WLR Board had acted in good faith.

**3.** We also note that it was within the district court's discretion to take into account the potential harm to WLR in allowing discovery into intimate details concerning WLR's business. *See* Fed.R.Civ.P. 26(b)(2) (the court may limit discovery where "the burden or expense of the proposed discovery outweighs its likely benefit").

The case of *Sandberg v. Virginia Bankshares, Inc.,* 891 F.2d 1112 (4th Cir.1989), *rev'd on other grounds,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), does not, as Tyson contends, dictate a contrary result. In *Sandberg,* we upheld a jury verdict finding that certain directors, in approving a merger, had failed to act in good faith under § 690. The bank in that case retained no independent investment advisor in order to assess a fair value for its stock, and merely issued a two-sentence statement recommending acceptance of an offer. *See id.* at 1117. Although the directors had consulted an investment consultant and relied on an executive committee, we stated that

> [t]he case against the directors is that they merely rubberstamped everything placed before them by Bankshares. The evidence fully supports a view that the directors exercised no independent judgment whatsoever with regard to the interests of the minority stockholders and consequently, was sufficient to support the jury's finding of lack of good faith.

*Id.* at 1123.

Tyson argues that if the court in *Sandberg* had restricted the jury's inquiry to the processes by which the directors made their decision, the jury would not have been able to make a finding that the directors had merely rubberstamped the information before them. However, as we stated above, we do not believe that it would be impossible for a jury to find that directors had merely rubberstamped a proposal if the jury had access to information regarding the advisors consulted by the directors, their qualifications, how they were selected, the general topics on which they advised, and whether the advice was followed. Thus, contrary to Tyson's assertions, access to the type of information that would be made available under our interpretation of § 690 also would have permitted a finding of lack of good faith in *Sandberg.*

> There are clear and compelling reasons for refusing to allow access to the internal operating information of a target corporation by a competitor who is in the process of attempting a hostile takeover. The potential damage to the target company is apparent.

We find the district court's decision limiting discovery in the instant case to be a sound one under Virginia law. Knowledge of the substantive advice given to the WLR Board was not reasonably calculated to lead to a determination regarding good faith as defined in § 690, and the district court acted within its discretion in limiting Tyson's access to that information.

## C. *Factual Findings*

Finally, Tyson attacks the factual findings of the district court on the issue of the WLR Board's good faith in rejecting Tyson's takeover offer. We reverse such findings only if clearly erroneous. *Diamond Star Bldg. Corp. v. Freed,* 30 F.3d 503, 506 (4th Cir. 1994).

■ Tyson asserts that, based on the evidence presented in the instant case, *i.e.,* even considering only the processes employed by the WLR Board in considering Tyson's offer, the district court clearly erred in finding that the WLR directors did not breach their duty of good faith to the shareholders by rejecting Tyson's offer and adopting defensive measures. Tyson claims that its offer was rejected as early as the first time that Don Tyson communicated with WLR director Keeler. Yet, although Keeler stated that WLR was "not for sale" when he was first approached by Don Tyson, WLR's management said at the same time that it would listen to Tyson's proposal. In fact, the WLR Board repeatedly acknowledged that although it had not put the company up for sale and did not wish to sell, the Board was required to consider Tyson's offer. WLR simply did not, as Tyson contends, reject the offer before considering the matter with the help of experts. The WLR Board had several extended meetings regarding Tyson's takeover offer and spent time and financial resources on gathering information from informed advisors, who Tyson does not argue were unreliable or incompetent. The district court found, based on an examination of the record, that the WLR Board had acted in good faith, and we are not inclined to reverse its finding.

## IV. *Control Share Referendum*

■ Finally, we reach Tyson's last challenge to the rulings below. After Tyson acquired the requisite percentage of WLR's stock to trigger a loss of voting rights under the Virginia Control Share Act, Va.Code Ann. §§ 13.1–728.1 to –728.9, a shareholder referendum was scheduled to determine whether Tyson's shares would reacquire any voting rights. Under the Control Share Act, Tyson needed a majority of the votes of the disinterested shareholders in order to gain such rights. The control share referendum was held on May 21, 1994, and was defeated. Tyson contends that by virtue of certain defensive measures taken by the WLR Board at its meeting on February 4, 1994, interested parties were permitted to vote in the control share referendum, thereby skewing the outcome of the vote. On appeal, Tyson contests the district court's finding that the challenged shares were not interested for purposes of the vote. Factual findings of the district court will be reversed only if they are clearly erroneous. *Freed,* 30 F.3d at 506.[4]

Interested shares may not be counted in a vote under the Control Share Act. Va.Code Ann. § 13.1–728.3(B). Interested shares are defined by the Control Share Act as shares held by the following: (1) the acquiring person in a control share acquisition, (2) an officer of the target corporation, or (3) an employee of the target corporation who is also a director of that corporation. *Id.* § 13.1–728.1. In addition, shares are interested if they are held by the "associates" of one of the above persons, who are defined as:

(i) any other person who directly or indirectly controls, or is controlled by or under common control with, any such person or who is acting or intends to act jointly or in concert with any such person in connection with the acquisition of or exercise of beneficial ownership over shares; (ii) any corporation or organization of which any such person is an officer, director or partner or as to which any such person performs a similar function; (iii) any other person hav-

---

4. In the district court, Tyson also challenged the record date that was set by the WLR Board in order to determine which shares were interested for purposes of the vote. Tyson has not raised that issue on appeal.

ing direct or indirect beneficial ownership of ten percent or more of any class of equity securities of any such person; (iv) any trust or estate in which any such person has a beneficial interest or as to which any such person serves as trustee or in a similar fiduciary capacity; and (v) any relative or spouse of any such person, or any relative of such spouse, any one of whom has the same residence as any such person. . . .

*Id.* The status of the shares is to be determined as of the record date. *Id.* § 13.1–728.3(B).

Tyson claims that the votes of the four directors who resigned as employees prior to the record date for the May 21, 1994 vote, Charles Wampler, William Wampler, Herman Mason, and George Bryan, should not have been counted in the control share referendum, because their resignations were not genuine.[5] According to Tyson, since the four men continued to be employees of WLR, their shares were interested for purposes of the control share referendum. *See id.* § 13.1–728.1 (shares of directors who are also employees are interested). Further, Tyson claims that simply subtracting the votes of the four directors and their associates from the final result to determine what the referendum count would have been if the allegedly interested shares had not been cast does not suffice as a remedy, because other voters were "intimidated" by the fact that the directors were planning to vote against Tyson and therefore voted the same way. In other words, Tyson claims that the entire result of the referendum was tainted by allowing the purportedly interested parties to vote.[6]

The Virginia statute is clear that the status of a share as interested should be determined as of the record date. *See id.* § 13.1–728.3(B). Therefore, if the four directors were no longer employees on the record date, they were entitled under the statute to cast their votes in the referendum. The district court performed an analysis of the functions and capacities of each of the four directors individually to determine whether they had actually ceased to function as employees on the record date. He found that, even before the record date for the referendum, the four directors in question had minimal involvement with the daily operations of WLR. Charles Wampler did not report to anyone at WLR. He signed no checks for the company, and did not have authority to direct WLR employees. He gave up his salary when he resigned as an employee. Similarly, William Wampler had drawn no salary from WLR since his resignation on February 4, 1994, had no office or secretary at the company, and did not direct other employees. Herman Mason also did not collect a salary as of April 14, 1994, could not hire or fire workers for WLR, had no secretary at the company, and other than performing his functions as a director, he served WLR only by giving advice to Keeler, which Keeler was free to follow or to disregard. Finally, George Bryan no longer received a salary as of February 4, 1994, and had not been instrumental in WLR's operations since the 1970s. In fact, he had been ill since before February 4, 1994, and had ceased to perform functions for WLR.

The district judge concluded, after his careful analysis of the functions and positions of the four directors, that none of the four was working as an employee of WLR on the record date. He also found that the health benefits which the four directors received were retirement benefits, as opposed to ongoing compensation for employee services. Although Tyson has mounted a broad challenge to the district judge's findings on the employee status of the four directors, Tyson has not pointed to any specific facts tending to show that the determination that the directors ceased to function as employees was incorrect. The district judge's factual findings regarding the status of the four directors, and his conclusion that they were no

---

**5.** WLR readily admits that the four directors resigned as employees of the company in order to be able to cast their votes in the control share referendum.

**6.** Tyson received 3,152,830 votes out of 10,896,672 shares eligible to vote. Tyson must therefore argue that the entire referendum was tainted, because even if all of the 1,395,930 shares challenged by Tyson were counted in its favor, it would not prevail based only on those votes.

longer WLR employees as of the record date, are amply supported by evidence in the record.

Tyson also claims that the entire WLR Board should have been precluded from voting in the referendum, because its members worked with Keeler, an interested director,[7] in procuring the resignations of the four directors, and thus should have been considered his "associates" in the sense used in the Virginia Control Share Act. Tyson therefore argues that the Board members were owners of interested shares not entitled to vote in the referendum. However, Tyson's contention in this regard depends largely upon its claim that the resignations of the four directors were "sham" resignations procured by Keeler with the help of other Board members. Under the factual findings of the district judge, which are supported by the record, we do not accept Tyson's theory of a great conspiracy among the Board of Directors of WLR. The Board members were simply not Keeler's associates as defined by the Control Share Act, *id.* § 13.1–728.1. The members of the Board whom Tyson wishes to classify as "associates" of Keeler were legitimately entitled to vote in the control share referendum.

■ Finally, Tyson contends that certain other individuals functioned as officers of WLR, and thus should have been excluded from the referendum voting. *See id.* § 13.1–728.1 (shares of officers of issuing public corporation are interested). Tyson claims that these "officers" agreed to vote against Tyson in exchange for receiving benefits and perks. Although WLR did, in fact, grant benefits to some of the people identified by Tyson, we find Tyson's challenge to their votes, also, to lack support in the record.

The shares of the four directors, as well as the shares of the other directors on the Board (excepting Keeler) were not interested, and they therefore were properly cast in the control share referendum. In addition, Tyson's contention that certain other individuals should be treated as officers and therefore not entitled to vote is without merit.

---

**7.** There is no dispute that Keeler, who was both an employee and a director of WLR, was not entitled to vote, *see* Va.Code Ann. § 13.1–728.1

*V. Conclusion*

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

(shares of director-employee are interested); his votes were not cast in the referendum.